## HUNT v. UNITED STATES et al.

District Court, S. D. New York.
Dec. 29, 1936.

Herman Rapport, of New York City (Jacquin Frank, of New York City, of counsel), for libelant.

Lamar Hardy, U. S. Atty., of New York City (Kirlin, Campbell, Hickox, Keating & McGrann and Raymond Parmer, all of New York City, of counsel), for respondent United States.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Raymond Parmer, of New York City, of counsel), for Roosevelt Steamship Lines, Inc.

HULBERT, District Judge.

The libelant, a seaman, sues under the Jones Act (46 U.S.C.A. § 688) claiming that the action is cognizable under the Suits in Admiralty Act (46 U.S.C.A. §§ 741–752) to recover damages for personal injuries sustained in the course of his employment aboard the motorship Potter.

On July 7, 1930, the United States of America, through the United States Shipping Board represented by the United States Shipping Board Merchant Fleet Corporation, entered into an agreement in writing with the Roosevelt Steamship Company, Inc., a Delaware corporation (hereinafter called the managing operator), whereby a number of government owned merchant vessels, including the motorship Potter, were allocated to the managing operator to conduct, for and on behalf of the government, the business of the American Pioneer Line on a "berth service."

The agreement was in the nature of a bare boat charter and was modified October 26, 1931, February 12, 1932, May 2, 1932, May 9, 1935, and September 26, 1935, terminating October 5, 1935.

None of the modifications materially affected the relationship between the parties thereto except the fourth addendum dated May 9, 1935, which limited the profits of the managing operator to $30,000 per annum and, as the respondents contended upon the trial, transformed the relationship of the managing operator to that of an agent for the owner as the principal.

The libel alleges:

"Eighth: That at the time hereinafter mentioned the Libelant was a seaman and in the employ of the defendants herein on the said motorship 'Potter'."

The defendants by their answers admitted employment of the libelant by the owner, but denied his employment by the managing operator, and also that he was a seaman within the meaning of the word as used in the Merchant Marine Act of 1920 (41 Stat. 988).

The motorship Potter arrived at the Port of New York, without cargo, on October 21, 1935, from India, via Cape of Good Hope and Baltimore, Md., and docked at a North River Pier. She then had aboard her usual complement of officers and crew, including six able seamen. The latter were paid off and replaced. Hunt was one of the able seamen thus engaged. He understood the vessel would make her next voyage to Australia and India, but was informed by the boatswain she would first go to drydock for repairs to engine and cargo holds, which would occupy two or three weeks. He did not sign any ship's articles, but accepted employment at the rate of $57.50 per month and found, and took his chance of being selected when the ship's articles were signed for the next voyage.

The time actually required for making repairs was ten weeks, the delay resulting from the delivery of machinery parts.

Hunt reported for duty on October 21, 1935, and was assigned as night watchman for that night; the next day the vessel cast off her lines and proceeded under her own power to a drydock in Brooklyn. On October 23, he was turned to with other able seamen in No. 2 hold cleaning out dunnage. This work was finished about noon, when he and the other five seamen aboard ship, and four or five additional seamen who had been "sent over from the

office" were assigned to cleaning and scraping the skin of the ship, preliminary to painting and rat-proofing, before the intended voyage. This work was all done under the direction and supervision of the master and chief officer upon direct orders given by the latter, or through the boatswain.

No. 2 hold was 83 feet long, 53 feet wide, and 23 feet deep. On either side were upper and lower sections of cargo battens. The batten boards in each section were about 10 feet long, 6 inches wide, and 2 inches thick and were nailed about 5 inches apart to crosspieces of approximately the same dimensions. The 6-inch surface of the crosspieces were laid flat to the rear surface of the batten boards and rested upon steel beams, leaving a space or pocket of about 4 inches between the crosspieces and the skin of the ship, thus providing a receptacle for dirt and nests for rats. The instructions were to remove the lower section of the battens so that the crosspieces might be removed by the ship's carpenter and replaced to lay flat on the crossbeams filling up the space above referred to.

Libelant and others were assigned to spot rust stains on the skin of the ship between and behind the batten boards of the upper cargo section and then paint the lower sections because of the stains from the ore cargoes carried by the vessel. Hunt claims to have inquired of the boatswain if stages were to be provided, complaining that scraping the long beams was tiresome and produced cramps, and that he was informed there was no staging aboard, and that the boatswain, in fact, asked him where the material for staging could be obtained. The proof, however, is, that the men employed painting the forward bulkhead of No. 2 hold worked on a staging because of the difficulty in handling the "gun" used for spraying the paint. The evidence is, the ship's carpenter was told by the chief officer to use dunnage boards for additional staging, but that he objected to their unsuitability for that purpose, and it is not disputed that there were several boatswain's chairs aboard and that their use was suggested by the boatswain.

In some instances, the seamen stood on the crosspiece holding onto the batten board with one hand and touching up the rust spots with the paint brush held in the other. Libelant, however, was one of those who used the boatswain's chair, to which was attached a lanyard. These boatswain's chairs were used in two different ways. Upon the upper section the libelant placed the lanyard behind a batten board and over the crosspiece and then tied the loose end with two half hitches; when working on the lower section the lanyard was pulled through rings or holes in the framework of the ship and made fast to the chair.

On October 29, 1935, shortly before the accident to the libelant, all of the seamen employed in No. 2 hold had transferred from the port to the starboard side, except Hunt. He had begun work that morning at a point 15 or 20 feet above the bottom of the hold, spotting rust around rivets; about twenty minutes later, as he changed the brush from his left to his right hand, the chair gave way, he grabbed a batten board and that came loose and he fell, striking his right buttock and spine on the battens which had been removed and placed upon a pipe casing leading from No. 1 bilge.

The evidence is that nails which had been driven to fasten the batten boards were, in some instances loose, and in other cases missing, and it is the contention of the libelant that the lanyard slipped between the crosspiece and the batten board. No one else in the hold saw the accident. The attention of the libelant's fellow workmen was first attracted by the crash. The respondents attempt to excuse the liability through the witness Miller (boatswain) who testified that as soon as he reached the point of the accident, Hunt informed him that while attempting to fasten his chair in the lower section by means of putting the free end of the lanyard through a hole in one of the longitudinal beams he lost his balance and fell a much shorter distance than he now claims.

It is apparent that libelant was so severely injured that it was deemed most practical, in his condition, to remove him from the hold to the dock in a sling and, in the light of this circumstance, I am not inclined to give credence to the explanation offered by the respondents.

Libelant was taken to the Marine Hospital at Ellis Island where he was placed on a fracture board. He remained in this hospital 21 days and was then transferred to the Marine Hospital at Staten Island where two weeks later he was put back on a fracture board. On January 14, 1936, he was discharged as "fit for duty," that is, the doctor who had on that occasion ex-

amined him for the first time (relieving the attending physician who was off duty that day) explained that Hunt was able to do light duty for a while and then resume regular duty.

It was testified by the libelant that during his previous experience as a seaman he had sustained:

1. Head cut, at Antwerp, Belgium, for which he was under treatment from July 13 to 21, 1927.

2. Fell into deep tank at Dunkirk, France, and was under treatment from December 3 to 7, 1927, for fractured heel.

3. Fell into water at Havre, France, August 17, 1930, and was kept in hospital seven days for observation.

4. Skin cut on instep at Havre, France, in 1930, and was under treatment for eight days for blood poisoning.

5. Injured wrist at Houston, Tex., in summer of 1934.

The most perplexing issue presented in the disposition of this case is the conflicting evidence of the medical experts and the Roentgenologists in reading · the X-ray plates which were examined by the aid of a shadow-box in the courtroom.

Immediately after libelant's admission to Marine Hospital at Ellis Island, the first X-rays were taken and, according to the Roentgenologist for the government, showed a triangulation of the first lumbar vertebra which, in his opinion, must have been due to a previous injury as it would not otherwise manifest itself so soon after the accident in question. Dr. Cobb, called as a witness by libelant, had never seen the X-rays above referred to, but testified that X-rays taken at the Marine Hospital at Staten Island indicated injuries neither shown by the X-rays taken at Ellis Island, nor apparently known to nor treated by the physicians who attended the libelant in the first instance. However, nothing is to be gained by reviewing in extenso and attempting to reconcile the widely divergent opinions thus expressed.

It is found that the libelant sustained: (1) Fractures of the twelfth rib near the vertebral border; (2) fracture of the ninth, tenth, and eleventh ribs in post axillary line; and (3) fractures of the transverse processes of the first, second, and third lumbar vertebra on the right side.

At the time of the trial there was a substantial improvement in libelant's condition, but still evidence of his injuries which, however, are not in my opinion of such a character as to permanently incapacitate him as he claimed.

At the outset of the trial, counsel for respondents stated:

"Before embarking on a description of our contention with regard to the merits, I wish to devote some remarks to some preliminary matters: This action is brought in form against three respondents. It is submitted that the vessel involved was a vessel of the United States. I understand that the suits in Admiralty Act permits a suit against the United States under such circumstances but does not permit suits against anyone else, and, therefore, I believe that at this time there should be either a discontinuance or a dismissal with regard to the respondent United States Shipping Board, Merchant Fleet Corporation and Roosevelt Steamship Lines, Inc."

The court reserved decision.

In accordance with the practice which obtains at least in this district in admiralty cases, no motion was made at the close of the libelant's case, nor was any motion made at the end of the respondents' case. In the brief of libelant's counsel, leave to discontinue (as to all respondents except the United States) was requested, and is now granted so that the preliminary objection becomes moot. However, there appears to be so much confusion, especially among the younger proctors who seem disposed to follow the procedure in state court actions tried to a jury, that the court feels disposed to call attention to the recognized practice, viz., that upon a motion to dismiss at the close of a libelant's case, respondent will be deemed to have rested his case also. The Persiana (D.C.) 158 F. 912. It may be that the tendency to modernize our procedure will prompt a change in this practice if it is again presented on appeal.

In the case of Bull et al. v. New York & Porto Rico S. S. Co. et al., 167 F. 792, 794 (C.C.A.2), the court said:

"We have no intention of sanctioning the common-law practice of sending causes back for a new trial, only to see them reappear again with a longer record, more or less modified from what was first presented."

The logic of this reasoning undoubtedly is that the Circuit Court of Appeals hears and decides admiralty cases de novo and therefore the full record should be pre-

sented in the first instance, although a libelant on appeal may be allowed to make new allegations in a supplemental libel in a proper case and take new proofs in that court. Munson S. S. Line v. Glasgow Nav. Co., Ltd. (C.C.A.) 235 F. 64.

We now proceed to the respondents' principal contention that libelant was not a member of the crew and, therefore, cannot maintain this action.

Section 3 of the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C.A. § 903) provides:

"Compensation shall be payable under this Act [chapter] in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—(1) A master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

If Hunt were not a member of the crew of the Potter, his right to compensation would be governed solely by the statute above referred to. (It may be noted in passing that the last day upon which the libelant might file a claim under this act expired during the course of this trial.)

In support of their contention, the respondents cite and rely upon:

1. Seneca Washed Gravel Corp. et al. v. McManigal et al., 65 F.(2d) 779 (C.C.A.2).

In that case the employee met an accidental death by falling overboard from a vessel upon which he was employed as a night watchman. The vessel was in winter quarters; that is, it had been withdrawn from navigation and hence decedent's duties did not require him to take any part in the navigation of the ship. He was the "night watchman the year round"; he never was on the vessel when she was under way; he lived on shore and was paid as an employee of the Seneca Company and not as a member of the ship's company.

2. Union Oil Co. et al. v. Pillsbury et al., 63 F.(2d) 925 (C.C.A.9), opinion by Mack, C. J., now assigned to S. D. N. Y.

The third officer of the steamship Montebello was paid off upon the arrival of his ship in port and re-engaged not as an officer or sailor, but as a night watchman on the vessel and only for the period while she was on drydock being overhauled.

3. Taylor et al. v. McManigal et al., 14 F.Supp. 419 (D.C.W.D.Mich.S.D.).

The steamer City of Grand Rapids operated on the Great Lakes only during the season of navigation and decedent had been employed as a member of the crew. When the vessel went into winter quarters for the purpose of overhauling and making repairs for the succeeding season, certain of her crew, including decedent (an engineer), were engaged for that purpose and they were hired as mechanics and laborers.

In all three of the cases cited the legal representatives of deceased employees had invoked the statute and the action in the District Court grew out of proceedings before the Deputy Commissioner United States Employees' Compensation Commission, who in each instance, had made a finding upon the evidence before him that the employee was not a member of the crew and in no one of these cases did the court disturb such finding.

In the case at bar, this court must determine the status of the libelant upon the evidence before it.

"Seaman" is defined in the Standard Dictionary as "one who takes part in the practical navigation of a vessel," and in Webster's as "one whose occupation is to assist in the management of ships at sea; a mariner; a sailor; applied to officers and especially to common sailors."

The respondents do not dispute that Hunt was a seaman, and make a concession which goes beyond the definitions above quoted.

In his brief, respondents' counsel states:

"Not only was he a seaman by profession but he was one when he was first employed on the steamship (sic) Potter, when he was engaged with other seamen in moving the vessel from its pier in the North River to Morse's Dry Dock, and also when he was working thereafter in cleaning and painting the hold. * * *

"Seaman though he may have been, he was not a member of the crew of the Potter after the vessel tied to its pier at Morse's Dry Dock and settled down to waiting for a period of over two months until the overhauling should be completed."

As a matter of fact, the libelant's physical connection with the ship was terminated within eight days after he was hired.

A "crew" according to the Standard Dictionary is a "group of seamen belonging to a vessel," and Webster says, "a company of seamen who man a ship, vessel or boat; the whole company belonging to a vessel or a boat."

Certainly it cannot be doubted that libelant was hired to become a member of the crew and the respondents concede that he was a member of the crew until the vessel had moved to and tied up at her pier at the drydock. While Hunt was paid weekly from a so-called "idle pay roll," his monthly rate of compensation never changed; he slept and ate on the boat, was subject to discipline demanded and the orders and directions given by the master and/or chief officer directly, or through the boatswain.

Workmen employed upon vessels definitely withdrawn from navigation, relegated to a ship's graveyard, are not seamen within the meaning of the National Marine Act, because not engaged in navigation. Gonzales v. United States Shipping Board Emergency Fleet Corp. (D.C.) 3 F.(2d) 168.

A vessel may be employed as a merchant vessel not merely when transporting cargo, but when going light to load and when awaiting repairs preparatory to inaugurating another voyage. Adams et al. v. United States (D.C.) 281 F. 895.

It is a historic axiom of admiralty courts that seamen shall be accorded special consideration and protection, and any ambiguity in the words of the statute affecting their rights, if reasonable to do so, should be resolved in their favor.

Consequently, I hold that Hunt was a member of the crew entitled to the status of a seaman under the National Marine Act to maintain this action under the suits in Admiralty Act and has established a good and substantial cause of action under the Jones Act and having sustained injuries for which the respondent United States of America is solely liable is entitled to recover damages in the sum of $6,000, for which a decree may be entered.

If these findings do not conform to Admiralty Rule 46½, 28 U.S.C.A. following section 723, either party may submit formal findings of fact and conclusions of law on three days notice to the other.