## CHARLES C. BRANNAN v. GREAT LAKES DREDGE & DOCK COMPANY.

91 N. W. (2d) 166.

June 20, 1958—No. 37,404.

*William H. DeParcq, Robert E. Anderson,* and *Robert N. Stone,* for appellant.

*Meagher, Geer, Markham & Anderson* and *O. C. Adamson II,* for respondent.

NELSON, JUSTICE.

Two actions were involved here. One action was to recover money damages for personal injuries sustained on July 12, 1955, by plaintiff, Charles C. Brannan, allegedly as a result of the negligence of defendant, Great Lakes Dredge & Dock Company, and of the unseaworthy condition of the dredge *Mogul,* of which defendant was the owner and upon which defendant employed plaintiff. The other action was to recover damages for maintenance and cure for the period of plaintiff's disability resulting from the injuries. The cases were tried together, and at the close of plaintiff's testimony the court directed a verdict for defendant in each case. The plaintiff thereafter moved the court below for an order setting aside the directed verdict and granting the plaintiff either judgment notwithstanding said verdict and a new trial on the issue of damages only or, in the alternative, a new trial on all issues. Plaintiff appeals from the order denying his motion.

The plaintiff, a resident of Superior, Wisconsin, 54 years of age, was injured when "mousing" a cable, pursuant to defendant's instructions while in its employ on its dredge. The wiring he was using broke, causing him to fall backwards through an unprotected opening in the upper deck which resulted from the removal of a muffler. Plaintiff fell to the deck below, landing on a large spool. He sustained a skull

fracture and other serious injuries.

The defendant is a corporation engaged in operating dredges on the Great Lakes. Between the years 1932 and 1955, the year of the accident, plaintiff had worked on numerous dredges as a deckhand, as a scowman, as a fireman, and as a watchman. He first went to work for defendant on the *Mogul* in November 1953 as a watchman while the dredge was tied up at the Carnegie dock site at the Duluth-Superior harbor. He was hired by John Koster, the captain of the *Mogul*. He worked in the capacity of a watchman 8 hours daily, 7 days a week. His duties consisted of firing and keeping up steam in a shore-based boiler which was maintained alongside the dredge through the winter to keep up enough heat in the vessel to prevent freezing and of generally keeping an eye on the vessel. He was required to inspect aboard the vessel once each hour. He was laid off by Captain Koster in April 1954, but was called back by him after a 30-day layoff and was assigned to the duties of and classified as a deckhand. These duties included replacing pontoons, replacing shore pipes, keeping the vessel free of rock and slag drippings, keeping the vessel clean, and changing buoys and markers. When plaintiff returned to work as a deckhand, the *Mogul* was in the process of being cleaned up, painted, and repaired for the purpose of going to work. After about 2 weeks it was moved into the Knudsen Shipyards in the same harbor where the crew continued painting and did some repair work on the spuds (part of the dredge that is used to anchor the vessel to the bottom) as ordered from time to time by defendant. After 2 or 3 weeks the *Mogul* was dispatched to dredge the Silver Bay harbor on Lake Superior. It was towed to Silver Bay by a tug. Plaintiff went along as an oiler, his duties consisting of oiling the spuds, auxiliary engines, and lower engines as well as the top of the A-frame and the boom.

The *Mogul* returned to Superior in October 1954, tying up at the Lamborn Avenue bridge site. Until November 10th or 12th plaintiff worked at getting the *Mogul* ready for the winter and thereafter remained as watchman through the winter of 1954. About the first week in May 1955 the *Mogul* was moved from the Lamborn Avenue bridge site to the Knudsen Shipyards in the same harbor, a distance of approximately 1 or 2 blocks for the purpose of undergoing repair.

Before the dredge went into drydock, the boom, the A-frame, and the spuds were removed and the engine dismantled and removed. Additional structure was installed on the boom to give it extra rigidity; minor work was done on the shivs of the A-frame; and cracks in the spuds were welded. The old diesel engine, used for operation of the boom and dipper, was dismantled and removed. The vessel was then moved into drydock and while in drydock work was done in repairing the lower portion of the spud well casings. The hull of the vessel was sandblasted and painted. After this was done the *Mogul* was put into a slip at one side of the boat works while wiring and piping was done and a new engine installed. The vessel's auxiliary engine was never removed. It appears that no structural work was necessary in the engine room to accommodate the new diesel.

At the time of plaintiff's injury July 12, 1955, the Knudsen Shipbuilding & Dry Dock Company had about 25 men in their employ working on the *Mogul* or on shore in connection with work on the *Mogul* under the charge of a repair foreman. At no time during this period did the repair foreman or anyone else from that company, or from the company doing the electrical work, have or exercise any control over plaintiff or the other men comprising Captain Koster's crew. During this period and at the time of plaintiff's injury there were approximately ten men employed by the defendant on board the *Mogul,* including Captain Koster; the chief engineer; three other engineers; two oilers; two deckhands, one of which was plaintiff Brannan; and Gene Koster, a son of the captain. All supervision and control of the crew was exercised by defendant through the captain of the vessel. Members of the crew did, however, assist in the removal of parts of the vessel to the extent of loosening certain attachments which would thereafter be removed by the shipyard employees.

By July 12, 1955, the *Mogul* had been removed from drydock and was docked at the west slip, which is a part of Lake Superior constituting navigable waters. Between the time it had left its winter quarters and been moved by tugs (the usual mode of locomotion of a dredge) to the docks for a refitting job and the time of plaintiff's injury, the *Mogul* was moved in and out of drydock. It was moved under its own power by use of an auxiliary engine, at no time removed, and deck

winches.

The work plaintiff was doing at the time he was injured was under the direction of Captain Koster. Plaintiff was being paid at the time as a deckhand, receiving a deckhand's rate of pay. During the period of repair, six crew members lived aboard the vessel, the plaintiff and the other crew members lived at home in Duluth or Superior while the ship was in port. When this accident occurred all work in the drydock had been completed. The crew was finishing the repairs necessary to its undertaking a major project on the St. Lawrence Seaway. So far as the record discloses, no claim is being made by defendant that the captain, the chief engineer, the oilers, or any one of the other 10 crew members, except Brannan, was a harbor worker rather than a seaman and a member of the crew. All were engaged in the same type of work and in accomplishing the same objective except the captain, whose duties were supervisory in character.

The record indicates that the *Mogul* did not actually get underway to undertake its project on the St. Lawrence Seaway until after Labor Day in 1955 when a test run was made to determine if it was seaworthy for the purposes for which it was to be used. The trial court was of the opinion that the *Mogul* was not in navigation until that time, even though it had undergone repairs to make it seaworthy and even though between April and the time of plaintiff's injury in July the *Mogul* had been moved in and out of drydock under its own power. The trial court took the view that since the *Mogul* was not in navigation on July 12, 1955, plaintiff did not classify as a "seaman" and a "member of a crew" to bring him within the purview of the Jones Act, 46 USCA, § 688, and remove him from the operation of the Longshoremen's and Harbor Workers' Compensation Act, 33 USCA, § 901, et seq. The trial court stated that the fact that he anticipated becoming a member of the crew if the dredge was again put in navigation was not important. The trial court appears to have reached the conclusion that the situation had resolved itself purely into a question of law; that the plaintiff came within the purview of the Longshoremen's and Harbor Workers' Compensation Act; and that that was his exclusive remedy.

The plaintiff in its assignment of errors contends that the trial court erred (1) in holding as a matter of law that the plaintiff was not a

seaman on a vessel in navigation under the meaning of the Jones Act and in directing verdicts for the defendant; and (2) in denying plaintiff's motion for a new trial.

The rule that on a motion for a directed verdict the evidence must be viewed in the light most favorable to the party opposing the motion applies here. A motion for a directed verdict by its very nature accepts the view of the entire evidence most favorable to the adverse party and admits the credibility, except in extreme cases, of the evidence in his favor and all reasonable inferences to be drawn therefrom. Woodrow v. Chicago, M. St. P. & P. R. Co. 239 Minn. 530, 60 N. W. (2d) 49; Village of Plummer v. Anchor Cas. Co. 240 Minn. 355, 61 N. W. (2d) 225; 19 Dunnell, Dig. (3 ed.) § 9764.

Plaintiff earnestly contends that under the evidence the foregoing issues together with the issue of defendant's negligence should have been submitted to the jury. It is elementary that, if, viewing the evidence as a whole in the light most favorable to the plaintiff, different persons could reasonably come to different conclusions, defendant's motion for a directed verdict should have been denied. Brady v. Kroll, 244 Minn. 525, 70 N. W. (2d) 354.

In South Chicago Coal & Dock Co. v. Bassett, 309 U. S. 251, 258, 60 S. Ct. 544, 548, 84 L. ed. 732, 736, the petitioners urged that the question whether the decedent was a member of a "crew" was a question of law. They urged that upon the undisputed facts the decedent in that case was as a matter of law a member of a "crew" as distinguished from a longshoreman or laborer at work upon the vessel. Mr. Chief Justice Hughes, speaking for the United States Supreme Court, said: "* * * We are unable so to conclude. The word 'crew' does not have an absolutely unvarying legal significance."

The Jones Act in pertinent part provides that (41 Stat. 1007, 46 USCA, § 688):

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; * * *."

34

As was said by the circuit court of appeals in McKie v. Diamond Marine Co. (5 Cir.) 204 F. (2d) 132, 134:

"* * * It is clear from the plain wording of the Act that its benefits were conferred upon any seaman who should suffer personal injury in the course of his employment. The right of recovery under the Act, as in the case of maintenance and cure, depends not on the place where the injury is inflicted, this being wholly immaterial, but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters."

The propositions involved on this appeal are of course based on two related sections of the Jones Act and the Longshoremen's and Harbor Workers' Compensation Act, which latter act provides (44 Stat. 1426, 33 USCA, § 903):

"(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—

"(1) A master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; * * *."[1]

Light is thrown upon the intention of Congress by the legislative history of the exception to be found in the Longshoremen's and Harbor Workers' Compensation Act in South Chicago Coal & Dock Co. v. Bassett, *supra*. It appears that the bill which became the Longshoremen's and Harbor Workers' Compensation Act was at one stage amended so as to include a master and members of a crew of a vessel owned by a citizen of the United States. They preferred, however, to

[1]For a summary of the general principles of the Jones Act, see 79 C. J. S., Seamen, § 191; also see, Lindgren v. United States, 281 U. S. 38, 50 S. Ct. 207, 74 L. ed. 686; Garrett v. Moore-McCormack Co. 317 U. S. 239, 63 S. Ct. 246, 87 L. ed. 239.

remain outside the compensation provisions and thus to retain the advantages of their election under the Jones Act and the bill was changed accordingly so as to exempt seamen. In its final passage, the words "a master or member of a crew" were substituted for "seamen." The United States Supreme Court in the South Chicago case said (309 U. S. 257, 60 S. Ct. 547, 84 L. ed. 736):

"* * * We think that this substitution has an important significance here. For we had held that longshoremen engaged on a vessel at a dock in navigable waters, in the work of loading or unloading, were 'seamen.' "[2]

A review of the most recent cases decided by the United States Supreme Court involving the Jones Act and the exception contained in the Longshoremen's and Harbor Workers' Compensation Act, and the cases therein cited and relied upon, indicates that the issue before this court on appeal is in the main limited to the following propositions: Does the record in the instant case present substantial evidence whereby a jury could reasonably find that the plaintiff was a "seaman" under the Jones Act; and does it also present substantial evidence from which a jury could reasonably find that the plaintiff is a "member of a crew" under the Longshoremen's Act? If the record discloses such evidence then the fact issues herein must be submitted to the jury, or if the record discloses that each side has supporting evidence for the conclusions it urges, such evidence would present an evidentiary basis for jury findings.

Plaintiff, herein, has in effect stated what amounts to three causes of action in two companion cases. He brings the negligence count under the Jones Act, and the unseaworthiness count under the general maritime law in one action, and the demand for maintenance and cure in the other action. The essential element under the Jones Act, if plaintiff qualifies as a "seaman" and a "member of a crew," is the negligence of the employer, while under the general maritime law of the United States an action is based on the contractual relationship by the seaman and employer and the breach of that contract by the unseaworthiness

---

[2]Also see, Nogueira v. New York, N. H. & H. R. Co. 281 U. S. 128, 50 S. Ct. 303, 74 L. ed. 754.

of the vessel. The action for maintenance and cure must stand or fall with the companion case hinging on the question whether the vessel involved was in navigation to the extent necessary to classify plaintiff as a member of a crew and thus entitle him to the rights of a seaman.

Plaintiff's appeal presents to this court the necessity of determining which of two Federal statutes is applicable. In order to recover under the Jones Act the injured person must be a seaman and the relation of master and servant must exist for the act gives a right of action only against his employer and the seaman must be injured in the course of his employment. The employer may be an individual or a corporation. While the act is limited to seamen employed on vessels of private ownership or operation, they do not have to be common carriers. The words "any seaman," in view of 46 USCA, § 713, have been held to mean any person who is employed on board any vessel belonging to a citizen of the United States, and this includes the master. The Jones Act was passed for the welfare of American seamen. A seaman is one whose occupation is to navigate vessels upon the sea including all those on board whose labor contributes to the accomplishment of the main object in which the vessel is engaged. The Jones Act applies to "Any seaman who shall suffer personal injury in the course of his employment * * *."

In Senko v. LaCrosse Dredging Corp. 352 U. S. 370, 77 S. Ct. 415, 1 L. ed. (2d) 404, it appears that the plaintiff was simply an ordinary laborer, a member of the Common Laborers' Union. While he was temporarily unemployed he applied to his union, which sent him to the defendant dredging company as a laborer. The defendant corporation was a contractor on a canal-digging project and employed a construction gang on shore under the supervision of a foreman. This foreman assigned Senko to take the job of "deckhand" or "laborer" on the company's dredge, a craft which, though afloat, served as a stationary earth-removing machine. Plaintiff served as a handyman to the team of men operating the earth-removing pumps, carrying supplies from the shore to the dredge and back, cleaning up the dredge, filling the water cooler, cleaning the lights and the lanterns and placing them when the construction work continued at night, taking "soundings" to measure the amount of silt pumped from the canal, and doing errands on shore,

working an 8-hour shift. He was paid by the hour. He lived at home, drove to work every day, and brought his own meals. It was claimed that he was not subject to the discipline and supervision of the officers of the vessel but of the labor foreman in charge of the construction project, who worked on shore, and that Senko could have been shifted to a job on shore by the foreman and replaced with one of the shore laborers in his position of "deckhand." He was injured by the explosion of a coal stove while placing signal lanterns from the dredge in a shed on the neighboring bank. We quote as follows from the court's opinion (352 U. S. 372, 77 S. Ct. 417, 1 L. ed. [2d] 407):

"It is true that the dredge was anchored to the shore at the time of petitioner's injury and during all the time petitioner worked for respondent. It is also true that this dredge, like most dredges, was not frequently in transit. We believe, however, that there is sufficient evidence in the record for the jury to decide that petitioner was permanently attached to and employed by the dredge as a member of its crew.

"Petitioner's witnesses testified that he was known as a 'deckhand' among rivermen. They said that he was hired to clean and take care of the deck, splice rope, stow supplies, and, in general, to keep the dredge 'in shape.' This testimony indicated that substantially all of petitioner's duties were performed on or for the dredge. A normal inference is that petitioner was responsible for its seaworthiness. If the dredge leaked, for example, the jury could suppose that his job would be to repair the leak. Furthermore, a witness testified that a usual duty of one holding petitioner's job was to take soundings and clean navigation lights when the dredge was in transit. * * * *Here again, the jury could reasonably have believed that petitioner would have these responsibilities in the event that this dredge were moved. Whether petitioner would be a member of the dredge's crew while taking soundings during a trip is certainly a jury question. If he were a member during travel, he would not necessarily lack that status during anchorage.* Even a transoceanic liner may be confined to berth for lengthy periods, and while there the ship is kept in repair by its 'crew.' *There can be no doubt that a member of its crew would be covered by the Jones Act during this period, even though the ship was never in transit during his*

*employment. In short, the duties of a man during a vessel's travel are relevant in determining whether he is a 'member of a crew' while the vessel is anchored. Thus, the fact that this dredge was connected to the shore cannot be controlling.*

"The fact that petitioner's injury occurred on land is not material. Admiralty jurisdiction and the coverage of the Jones Act depends only on a finding that the injured was 'an employee of the vessel, engaged in the course of his employment' at the time of his injury. [Cases cited.]

"As we have said before, this Court does not normally sit to re-examine a finding of the type that was made below. We believe, however, that our decision in South Chicago Co. v. Bassett, *supra,* has not been fully understood. *Our holding there that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact. The essence of this discretion is that a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate.*

"*Because there was testimony introduced by petitioner tending to show that he was employed almost solely on the dredge, that his duty was primarily to maintain the dredge during its anchorage and for its future trips, and that he would have a significant navigational function when the dredge was put in transit, we hold there was sufficient evidence in the record to support the finding that petitioner was a member of the dredge's crew.* [Case cited.] Accordingly, we reverse the decision below." (Italics supplied.)

To be a "seaman," as may be seen from the Senko case and other cases cited and relied upon therein, it is not required that the employee work solely in aid of navigation or that he be on board primarily to aid in navigation. It also seems to be generally understood that a "member of a crew" is one of those employees who are naturally and primarily on board to aid in navigation. There must be a more or less permanent connection between the ship and the worker as opposed to the temporary relationship existing in the case of a carpenter or a mechanic who is brought aboard only to do repair work while the ship is in port. As a consequence a longshoreman is not a "member of a crew." The

character of the work done at the time of the accident is not determinative. In Carumbo v. Cape Cod S. S. Co. (1 Cir.) 123 F. (2d) 991, 994, which defines "member of a crew" and "navigation," the court said:

"* * * it is well established that the word 'seaman' under the Jones Act does not mean the same thing as 'member of a crew' under the Longshoremen's Act. * * * To recover in this suit [under the Jones Act], plaintiff must be a 'seaman' and a 'member of a crew'.

\* \* \* \* \*

"* * * The process of liberal construction of the Jones Act cannot now be ignored because Congress has seen fit to pass the Longshoremen's Act. As a result of the cases, we feel constrained to hold that one who does any sort of work aboard a ship in navigation is a 'seaman' within the meaning of the Jones Act.

"* * * One cannot be a 'member of a crew' if the ship is not in navigation. * * *

"* * * It is our opinion that a ship is in navigation, although docked, if it remains in readiness for another voyage. It need not be under contract."

It has been held that a ship is in navigation when it returns from a voyage and is taken to drydock to undergo repairs preparatory to making another trip. Hunt v. United States (S. D. N. Y.) 17 F. Supp. 578, affirmed (2 Cir.) 91 F. (2d) 1014; Hawn v. American S. S. Co. (2 Cir.) 107 F. (2d) 999.

In United States v. Lindgren (4 Cir.) 28 F. (2d) 725, 728, affirmed, 281 U. S. 38, 50 S. Ct. 207, 74 L. ed. 686, the court said:

"Certainly seamen employed to take a ship to sea who are engaged in making her ready for the voyage are not to be denied the status of seamen and the benefit of the act merely because the vessel is not commissioned at the time."

In Maryland Cas. Co. v. Lawson (5 Cir.) 94 F. (2d) 190, 192, the court in defining "member of a crew" said:

"* * * There is implied a definite and permanent connection with the vessel, an obligation to forward her enterprise and to protect her

in emergency, and a right to look to her and her earnings for wages. If she has a master, there is subjection to his commands. The nature of the work done is not determinative. Engineers and cooks as well as sailors are included. Longshoremen who load and unload a vessel under temporary local employment do not become members of the crew, nor do mechanics who similarly come aboard her to repair or clean or paint her; nor do those permanently employed upon her cease to be members of the crew because they are put at the same sort of work."[3]

The Jones Act incorporated into the maritime law the provisions of the Federal Employers' Liability Act, 45 USCA, §§ 51 to 60. The two Federal statutes have since been read in conjunction with each other. The Federal decisions interpreting the provisions of the Federal Employers' Liability Act and the function of the jury in such cases are controlling whenever a petitioner is entitled to maintain his suit under the Jones Act. It becomes clear when considering the related portions of the Jones Act and the Longshoremen's Act together that the purpose of the Jones Act is to give seamen injured in the course of their employment the right to maintain an action at law for the recovery of damages, with the right of trial by jury, and to eliminate the defense of the fellow-servant doctrine and contributory negligence as a complete bar to recovery. The Jones Act, however, does not affect the ancient rights of a seaman to maintenance and cure. Those rights remain and the remedy in admiralty under the general maritime law is unaltered. Neither does the act affect his right to sue the owners of the ship for injuries sustained as a result of their breach of contract to provide a seaworthy vessel for indemnity, beyond maintenance and cure, in a common-law court with the right of trial by jury.

The purpose of the Longshoremen's Act was to provide compensation for a class of employees that worked on vessels in navigable waters, who, although they might be classed as "seamen," were regarded as distinct from "members of a crew," being employees whose service was of the sort performed by longshoremen and harbor workers as distinguished from those employees regularly on the vessel.

---

[3]See, Mamat v. United Fruit Co. (S. D. N. Y.) 39 F. Supp. 103; Kraft v. A. H. Bull S. S. Co. (S. D. N. Y.) 28 F. Supp. 437.

Thus if a plaintiff is a "seaman" under the Jones Act and a "member of a crew" under the Longshoremen's Act, he is free to sue under the Jones Act, and unless the facts are undisputed, the issue of whether or not the plaintiff is a seaman under the Jones Act and a member of the crew within the meaning of the Longshoremen's Act is for the jury's determination. It is well established that the word "seaman" under the Jones Act does not mean the same as "member of a crew" under the Longshoremen's Act. See, Silva v. Gorton Pew Fisheries Co. Ltd. 303 Mass. 531, 22 N. E. (2d) 31. "Seaman" is broad enough to cover both one who is a "member of the crew" and one who is not a member of the crew. To recover in the instant action plaintiff must classify as a "seaman" and as a "member of a crew." See, International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. ed. 157.[4]

It seems to be well established that a dredge is a vessel within the meaning of the Jones Act even though it has no power of its own and that a "deckhand" may, dependent upon the particular facts involved, qualify as a "seaman" and a "member of a crew" of the vessel under the Jones Act and become entitled to the protection of that act if injured during his employment.[5]

In Texas Co. v. Gianfala (5 Cir.) 222 F. (2d) 382, the jury found for the plaintiff. The circuit court of appeals reversed a holding that a workman aboard a vessel not as a member of the ship's crew but as a member of an oil drilling crew was not a seaman under the Jones Act. The court held that the vessel involved was not at the time of the accident in navigation for the reason that it was "sunken and fast" as a part of equipment for drilling an oil well. The workman was handling tubing,

---

[4]On the question of whether dredge workers are under the protection of the Jones Act and subject to classification as members of the crew (which seems to be beyond dispute), see Gahagan Const. Corp. v. Armao (1 Cir.) 165 F. (2d) 301; Kibadeaux v. Standard Dredging Co. (5 Cir.) 81 F. (2d) 670; McKie v. Diamond Marine Co. (5 Cir.) 204 F. (2d) 132; Maryland Cas. Co. v. Lawson (5 Cir.) 94 F. (2d) 190; Melanson v. Bay State Dredging & Contracting Co. (D. Mass.) 62 F. Supp. 482.

[5]E. g., O'Donnell v. Great Lakes Dredge & Dock Co. 318 U. S. 36, 63 S. Ct. 488, 87 L. ed. 596; Early v. American Dredging Co. (E. D. Pa.) 101 F. Supp. 393.

work done strictly and only by oilfield workers. The district court submitted for the jury's determination the questions whether the plaintiff was a "seaman" and a "member of a crew" and whether the sunken ship was a vessel and if the vessel was in navigation. The court of appeals reversed but the United States Supreme Court (350 U. S. 879, 76 S. Ct. 141, 100 L. ed. 775) reversed the court of appeals and remanded the case to the district court with directions to reinstate judgment for the plaintiff, citing South Chicago Coal & Dock Co. v. Bassett, 309 U. S. 251, 60 S. Ct. 544, 84 L. ed. 732; Summerlin v. Massman Const. Co. (4 Cir.) 199 F. (2d) 715; Wilkes v. Mississippi River Sand & Gravel Co. (6 Cir.) 202 F. (2d) 383; Gahagan Const. Corp. v. Armao (1 Cir.) 165 F. (2d) 301. The district court in the Texas Co. case had, according to the circuit court opinion, relied primarily upon McKie v. Diamond Marine Co. (5 Cir.) 204 F. (2d) 132. The reversal of the circuit court decision indicates that the district court correctly submitted certain questions as fact issues for the jury's determination. In the McKie case the court in commenting on the issue of whether the vessel was in navigation said that the nautical phrase "plying in navigable waters" does not mean that the vessel must, in the very moment of the injury, have been actually in motion on navigable waters.[6]

It appears that the United States Supreme Court has taken the position, consistently, beginning with the South Chicago case and followed by the Cantey, Texas Co., and Senko cases, that (even where facts are undisputed) the determination of whether an individual is a "member of a crew" and of the subsidiary question of whether the vessel was in navigation are questions of fact and that it is the function of the jury to determine those fact questions. Gahagan Const. Corp. v. Armao,

---

[6]See, Cantey v. McLain Line, Inc. 312 U. S. 667, 61 S. Ct. 829, 85 L. ed. 1111, reversing (S. D. N. Y.) 32 F. Supp. 1023, affirmed (2 Cir.) 114 F. (2d) 1017. In Bowen v. Shamrock Towing Co. (2 Cir.) 139 F. (2d) 674, it was held that the word "crew" does not have an unvarying legal significance and the court, following the authority of the Cantey and South Chicago cases, held that the question of whether the workman was to be classified as a seaman presented issues of fact for determination by the jury or the court, as the case may be.

*supra;* McKie v. Diamond Marine Co. *supra;* Wilkes v. Mississippi River Sand & Gravel Co. *supra.*

In the recent case of Grimes v. Raymond Concrete Pile Co. 356 U. S. 252, 78 S. Ct. 687, 2 L. ed. (2d) 737, the petitioner brought suit in the District Court for the District of Massachusetts. He sought damages under the Jones Act for injuries suffered while being transferred at sea in a "Navy life ring" from a tug to a Texas tower which his employers were constructing under a contract with the government on Georges Bank, 110 miles east of Cape Cod. The district court directed a verdict in favor of defendants taking the view that the evidence created a fact question on the issue as to whether the petitioner was a crew member but that the petitioner's exclusive remedy was under the Defense Bases Act, 42 USCA, §§ 1651 to 1654. The circuit court held that the Defense Bases Act did not provide the exclusive remedy for a member of a crew in light of § 1654 of the act providing "This chapter shall not apply in respect to the injury * * * of * * * (3) a master or member of a crew of any vessel." The circuit court, nevertheless, affirmed the district court's judgment, one judge dissenting, upon the ground that the evidence was not sufficient to create a fact question as to whether the petitioner was a crew member. Grimes v. Raymond Concrete Pile Co. (1 Cir.) 245 F. (2d) 437. The United States Supreme Court granted certiorari. 355 U. S. 867, 78 S. Ct. 123, 2 L. ed. (2d) 73. On review the Supreme Court said (356 U. S. 252, 253, 78 S. Ct. 687, 688, 2 L. ed. [2d] 737, 739):

"We hold, in agreement with the Court of Appeals, that 42 U. S. C. § 1654 saves the remedy under the Jones Act created for a member of a crew of any vessel. We hold further, however, in disagreement with the Court of Appeals, that the petitioner's evidence presented an evidentiary basis for a jury's finding whether or not the petitioner was a member of a crew of any vessel," citing Senko v. LaCrosse Dredging Corp. 352 U. S. 370, 77 S. Ct. 415, 1 L. ed. (2d) 404; Gianfala v. Texas Co. 350 U. S. 879, 76 S. Ct. 141, 100 L. ed. 775; South Chicago Coal & Dock Co. v. Bassett, 309 U. S. 251, 60 S. Ct. 544, 84 L. ed. 732.

It reversed the judgment and remanded the case to the district court

for further proceedings not inconsistent with the opinion.

Again on April 14, 1958, the Supreme Court of the United States rendered its opinion in Butler v. Whiteman, 356 U. S. 271, 78 S. Ct. 734, 2 L. ed. (2d) 754. The facts in that case appear to be that defendant was the owner of a wharf, barge, and tug, all situated on the Mississippi River. The barge was moored to the wharf, and the tug was lashed to the barge. On October 7, 1953, the decedent met death by drowning in unclear circumstances. He was last seen alive running across the barge to the tug. It was claimed that the defendant was liable under the Jones Act because of negligence in failing to provide a gangplank for crossing between the two vessels. The tug had been withdrawn from navigation for some months before the accident occurred because it was inoperable, and during the entire year of 1953 the tug had neither captain nor crew and reported no earnings. It appears that the only evidence of its movement during the year related to an occasion on which it was towed to drydock. The tug was undergoing rehabilitation preparatory to a Coast Guard inspection, presumably in anticipation of a return to service, at the time the accident occurred. The decedent was employed as a laborer doing odd jobs around defendant's wharf during the period of the tug's inactivity. On the morning of the accident he had been engaged in cleaning the boiler of the tug. The United States Supreme Court, in reversing the judgment of the court of appeals and remanding the case for trial, said (356 U. S. 271, 78 S. Ct. 734, 2 L. ed. [2d] 755):

"* * * We hold that the petitioner's evidence presented an evidentiary basis for jury findings (1) whether or not the tug G. W. Whiteman was in navigation, Senko v. LaCrosse Dredging Corp., 352 U. S. 370, 373; Carumbo v. Cape Cod S. S. Co., 123 F. 2d 991; (2) whether or not the petitioner's decedent was a seaman and member of the crew of the tug within the meaning of the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688; Senko v. LaCrosse Dredging Corp., supra; Gianfala v. Texas Co., 350 U. S. 879; South Chicago Co. v. Bassett, 309 U. S. 251; Grimes v. Raymond Concrete Pile Co., 356 U. S. 252; and (3) whether or not employer negligence played a part in producing decedent's death. Ferguson v. Moore-McCormack Lines, 352 U. S. 521; Rogers v.

Missouri Pacific R. Co., 352 U. S. 500; Schulz v. Pennsylvania R. Co., 350 U. S. 523."

 It appears to us after a careful consideration of the record in the case at bar that the rights of the plaintiff differ very materially from those of the employees under contract with the Knudsen Shipyards and the Benson Electric Company. It also appears from the testimony that plaintiff had since 1932 worked on various dredges as deckhand and in other capacities as a member of the crew, including the *Mogul,* beginning in 1953; that he was employed by defendant to work on the *Mogul* as a deckhand under the supervision of its captain; that he was paid as such; that he took his orders from its captain and did not take his orders from the supervisory personnel of Knudsen Shipyards or Benson Electric; that plaintiff's entire working day was spent on or in behalf of the vessel; and that at the time of the injury he was engaged in a strictly nautical job, "mousing" a cable. The employees of the aforesaid contractors did no such work. Their employees spent much of their working time on shore and are admittedly classified as harbor workers.

The *Mogul* was being refitted in order to proceed to a distant dredging job on the St. Lawrence Seaway. It was afloat on navigable waters in Lake Superior when the accident occurred. Based upon all the facts upon which plaintiff relies and the recent pronouncements of the United States Supreme Court in the Grimes and Butler cases, consistently following the rules enunciated in the Senko, Carumbo, Gianfala, and South Chicago cases, it appears to us that the questions whether the *Mogul* was, under a liberal construction of the Jones Act, in navigation when the accident occurred and whether plaintiff was a "seaman" and a "member of a crew" on the *Mogul* on July 12, 1955, the date of the accident, as well as the question of defendant's negligence, should have been submitted to the jury as fact issues for their determination. We are unable to agree that the cases cited by the defendant herein and relied upon by the trial court in directing a verdict are controlling of the fact issues in the case at bar. Since there must be a new trial we have refrained from a consideration of any payments received and later discontinued under the Longshoremen's and Harbor

Workers' Compensation Act.

We therefore reach the conclusion that the order of the trial court must be reversed upon the grounds and for the reasons that the record as submitted on this appeal presents an evidentiary basis for jury findings on the aforesaid issues. Plaintiff is granted a new trial on all issues.

Reversed and new trial granted.