[No. 37604.   Department One.   August 12, 1965.]

PAUL R. BISHOP, *Appellant,* v. ALASKA STEAMSHIP COMPANY, *Respondent.*[*]

[*]Reported in 404 P.2d 990.

*Soriano & Soriano,* for appellant.

*Bogle, Bogle & Gates* and *Edward S. Franklin,* for respondent.

HALE, J.—There was a tang of salt air and movement of wind and wave about the SS *Fortuna* as she lay on blocks in floating dry dock, and perhaps gulls perched on her railings or soared above her stacks, and to everyone who looked upon her she seemed a ship of the sea. Whether thus cradled she was a ship to all who came near her states our problem. We are to decide if the warranty of seaworthiness, ordinarily said in admiralty to protect seamen and others in their stead, may, as a matter of law, be denied a shipyard employee injured while working on a ship in dry dock.

In January, 1960, the SS *Fortuna,* structurally damaged in collision at Seward the preceding May, arrived at Seattle from Alaska, discharged her cargo and stood by with her crew for repairs. Todd Shipyard Corporation made a contract with her owner, Alaska Steamship Company, to do the work, both owner and shipyard recognizing the repairs to be extensive enough to keep the ship on dry dock for several days.

A pilot steered the SS *Fortuna* into Todd's Seattle shipyard January 5, 1960, where her engines were shut down and the ship's officers and crew, being paid off, left the vessel. That day she was pulled into a floating dry dock and raised onto blocks. The *Fortuna* stayed in dry dock continuously until January 11, 1960, when, on completion of repairs, a new crew came aboard, put the engines in operation, and, with the refloating of the ship, took her to sea on her next voyage.

On January 6, 1960, the second day in dry dock, Paul R. Bishop, a rigger employed by the Todd Shipyard Corporation, sustained serious injuries in a fall from the scaffolding while doing repair work to the ship in the perform-

ance of Todd's contract with the owner. Mr. Bishop, with experience at sea stemming from his first voyage at the age of 14 or 15, was, at the age of 51, regularly employed by Todd's in its shipyards and dry docks. On that day, he worked under the shipyard's rigging boss as one of a crew of six riggers whose job was to pull the propeller on the *Fortuna*—that is, remove it from its shaft. Shortly after the noon lunch period, while engaged in loosening the nuts from the propeller shaft with a 24-inch steel bar, Mr. Bishop fell from his work platform when the 12-foot plank on which he had been standing gave way, dropping the plank and Bishop onto the deck of the floating dry dock. The plank on which he had been standing and working was supported by a steel scaffold at each end, with the scaffolds resting on the dry dock deck. The plank, scaffolds, dry dock and tools used by Mr. Bishop were owned and furnished by Todd Shipyard Corporation; the propeller being removed was a part of the *Fortuna*'s equipment.

Thus, Mr. Bishop, a regular employee of Todd Shipyard Corporation, sustained his injury in a fall from scaffolding while engaged for his employer in the performance of an independent contract to repair, under the exclusive supervision of his employer's foreman and supervisors, and while standing on a scaffolding platform and using tools furnished by his employer. None of the ship's structure, gear, equipment, tools or engines contributed to the cause of the accident; none of her officers and crew participated in the repair work; nor was Bishop aboard the *Fortuna* when he fell.

From the pleadings, admissions, depositions and affidavits in pretrial, the foregoing facts appear, and there is no evidence offered from which a conflict in the evidence may be said to arise. Respondent steamship company moved for a summary judgment of dismissal under Rule of Pleading, Practice and Procedure 56 (b), RCW vol. 0, 3 Orland, Wash. Prac. 48, on the ground that, there being no genuine issue of fact on the question of liability, respondent should have judgment of dismissal as a matter of law on the facts es-

tablished. From summary judgment of dismissal granted on this motion, plaintiff appeals.

The appeal raises three questions which must from their very nature be considered in pari materia:

(1) Was the SS *Fortuna* in process of navigation?

(2) Was plaintiff in the performance of work or engaged in actions entitling him to the warranty of seaworthiness?

(3) Where the facts are not in conflict, may the question of navigation be determined as a matter of law or must that issue be resolved by a jury?

As happens from time to time, the salient doctrine involved in this case has its origin in dicta. In 1903, the first case, to our knowledge, to embrace the doctrine of seaworthiness—affording indemnity to a seaman for injuries caused by the ship's unseaworthy condition or the unseaworthy state of its appliances and equipment—occurred in *The Osceola,* 189 U.S. 158, 47 L. Ed. 760, 23 Sup. Ct. 483 (1903). See Gilmore & Black, The Law of Admiralty ch. 6, § 6-38 (1957 ed.). Since 1903, the warranty of seaworthiness has become a fundamental rule in admiralty, and we have applied the warranty whenever appropriate in admiralty causes. *Sullivan v. Lyon S.S. Ltd.,* 63 Wn.2d 316, 387 P.2d 76 (1963).

■ The *warranty of seaworthiness,* imposing as it does a species of liability without fault, derives from special consideration said by the courts to be owed from a ship and its owners to her crew. By constant application, the doctrine has expanded judicially to encompass and protect not only the crew but others serving the ship in doing the crew's work, including the kind of work and duty performed by modern mariners using steam, electric and mechanical power, and the work and duty performed by seamen traditionally in the days of sail. Collating a few of the leading cases will demonstrate the genesis and development of the doctrine.

*Atlantic Transport Co. of West Virgina v. Imbrovek,* 234 U.S. 52, 58 L. Ed. 1208, 34 Sup. Ct. 733 (1914), referring to ship's work as the performance of a maritime service, car-

ried the warranty of seaworthiness to a land-based stevedore injured aboard ship while loading copper, saying:

> The libelant was injured on a ship, lying in navigable waters, and while he was engaged in the performance of a maritime service. We entertain no doubt that the service in loading and stowing a ship's cargo is of this character. . . . Formerly the work was done by the ship's crew; but, owing to the exigencies of increasing commerce and the demand for rapidity and special skill, it has become a specialized service devolving upon a class 'as clearly identified with maritime affairs as are the mariners.'

*Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 88 L. Ed. 561, 64 Sup. Ct. 455 (1944), connected the doctrine of seaworthiness to the ship's gear. There, petitioner, a seaman, was injured while at sea in a fall from staging which gave way when a piece of defective rope supporting the staging parted.

The rope, rotten and defective, had been selected by the mate although the ship had an ample supply of sound rope available for use in rigging the staging. Holding that a finding of seaworthiness depends on the use to which the equipment or gear is ordinarily put, the court affirmed the *Osceola* doctrine as follows:

> But the admiralty rule that the vessel and owner are liable to indemnify a seaman for injury caused by unseaworthiness of the vessel or its appurtenant appliances and equipment, has been the settled law since this Court's ruling to that effect in *The Osceola, supra,* 175. *Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 380-381; *Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 258-260; *Pacific S.S. Co. v. Peterson,* 278 U.S. 130, 134; *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 370-371; *Warner v. Goltra,* 293 U.S. 155, 158; *The Arizona v. Anelich,* 298 U.S. 110, 120 *et seq.; Socony-Vacuum Co. v. Smith, supra,* [305 U.S. 424], 428-429; *O'Donnell v. Great Lakes Co.,* 318 U.S. 36, 40.
>
> . . . . .
>
> The staging from which petitioner fell was an appliance appurtenant to the ship. It was unseaworthy in the sense that it was inadequate for the purpose for which it was ordinarily used, because of the defective rope with which it was rigged. Its inadequacy rendered it

unseaworthy, whether the mate's failure to observe the defect was negligent or unavoidable.

Other cases broadened the protection to shore-based workers using the ship's gear and equipment. Thus, in *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 90 L. Ed. 1099, 66 Sup. Ct. 872 (1946), a stevedore injured from a falling boom while loading a ship at dockside was held entitled to the warranty of seaworthiness because he was at the time doing what has come to be described as ship's work, even though not employed by the ship or owner but by an independent contractor. Where the injured party suffers injuries while working on board the ship in navigable waters, if he is doing seamen's work and incurring seamen's hazards, he is entitled to seamen's protection. In line with *Sieracki, supra, Pope & Talbot, Inc., v. Hawn,* 346 U.S. 406, 98 L. Ed. 143, 74 Sup. Ct. 202 (1953), extended the warranty of seaworthiness to the employee of an independent contractor, a carpenter, who fell through a hatch while repairing some grain loading equipment. In both cases, the opinions rest in part on the idea that the work being done by Sieracki, a stevedore, and Hawn, a carpenter, had traditionally been the work of the ship's crew, and in part on the rationale that the ships were in the course of navigation.

In *Crumady v. The Joachim Hendrik Fisser,* 358 U.S. 423, 3 L. Ed.2d 413, 79 Sup. Ct. 445 (1959), liability fell on the ship's owner not only because the injured plaintiff was doing ship's work or engaged in the ship's service but also because the injury occurred from the use of the ship's equipment. Thus, the ship and its owner are held to warrant the seaworthiness of her gear and equipment to all persons using them in the ship's service and additionally warrant a competent crew to keep the gear and equipment in a seaworthy condition. These responsibilities cannot be delegated or avoided by turning control of the unloading and loading activities over to a stevedoring company as an independent contractor. Said the court:

> This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. *Seas Shipping Co. v. Sieracki, supra* [328 U.S. 85], at 100. Unsea-

worthiness extends not only to the vessel but to the crew (*Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336) and to appliances that are appurtenant to the ship.

But *United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki,* 358 U.S. 613, 3 L. Ed.2d 541, 79 Sup. Ct. 517 (1959), seems to curtail in some degree the widening application of the warranty. There an electrician employed by a subcontractor was engaged in dismantling and overhauling the ship's generators in the engine room. The job required the generators to be cleaned with carbon tetrachloride, a dangerously toxic compound. Despite the use of gas masks and specially rigged air hoses to supply ventilation, the plaintiff died two weeks later from tetrachloride poisoning. Said the court:

A measure of how foreign was the decedent's work to that ordinarily performed by the ship's crew is that it could be performed only at a time when all the members of the crew were off the ship.

It avails nothing to say that the decedent was an "electrician," and that many modern ships carry electricians in their crew. *Pope & Talbot v. Hawn* [346 U.S. 406] explicitly teaches that such labels in this domain are meaningless. See 346 U.S., at 413. It is scarcely more helpful to indulge in the euphemism that the decedent was "cleaning" part of the ship, and to say that it is a traditional duty of seamen to keep their ship clean. The basic fact is, in the apt words of Judge Lumbard's dissenting opinion in the Court of Appeals, that the decedent "was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed." 251 F. 2d 708, at 715. To extend liability for unseaworthiness to the decedent here would distort the law of *Mahnich,* of *Hawn* and of *Sieracki* beyond recognition. We therefore hold that it was error to instruct the jury that the shipowner could be held liable in this case even if they should find that the shipowner had exercised reasonable care.

In *West v. United States,* 361 U.S. 118, 4 L. Ed.2d 161, 80 Sup. Ct. 189 (1959), the ship on which the injuries occurred had been in storage with the "mothball fleet" for several years; it was removed from storage and towed to Philadelphia to be made seaworthy by a repair contractor.

The plaintiff, a shore-based employee of the repair contractor, sustained injuries while working inside the low pressure cylinder of the main engine. Denying him the warranty of seaworthiness, the court said:

> The *Mary Austin*, as anyone could see, was not in maritime service. She was undergoing major repairs and complete renovation, as the petitioner knew. Furthermore, he took his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not "ship's work" but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case.

And, extending the doctrine of seaworthiness to the farthermost point yet noted by us is *Gutierrez v. Waterman S. S. Corp.*, 373 U.S. 206, 10 L. Ed.2d 297, 83 Sup. Ct. 1185 (1963), where plaintiff, a longshoreman working on the dock, slipped on spilled beans, suffering injuries from the fall. The beans had spilled from broken bags during unloading and created a slippery condition on the dock. Applying the doctrine of seaworthiness to cargo containers, the court said:

> A ship that leaks is unseaworthy; so is a cargo container that leaks.
>
> . . . .
>
> [T]he duty to provide a seaworthy ship and gear, including cargo containers, applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier.

Thus, in synthesizing the leading cases on the subject, we see that the warranty of seaworthiness derives from and attaches to many things maritime: a ship in navigation, that is, actual maritime service; ship's work—embracing tasks done now or in the traditional past by the ship's crew; ship's equipment, gear and cargo containers; and operations over which the ship's owner's agents or crew have substantial control and direction. But the one indispensable ingredient — the one maritime constituent

that must exist before it can be said that the owners or the ship owe the warranty—is that it be a ship in navigational service. There must be about the vessel more than the tang of sea air and the cry of gulls upon which to fasten the warranty of seaworthiness. Unless it is a ship either in course of or standing by to engage in navigation, it is not a ship for the purposes of the warranty.

■ Adverting now to the questions posed by this appeal, we are of the opinion that, where, as here, unconflicting evidence so clearly shows whether the ship was in navigation that reasonable minds could not differ on the question, the court may decide the point as a matter of law. This question the court rightly decided here in holding that the SS *Fortuna* was not in navigation. No issue of fact on the question of navigation then remained for trial by jury.

To summarize, the SS *Fortuna* had been raised onto blocks for a sojourn in dry dock and was not, therefore, in navigation. She was undergoing removal of her propeller and structural repairs, neither of which can be said to have been ship's work; plaintiff was using none of the ship's gear, equipment, tools, or cargo containers nor taking any direction or orders from her owners, officers or crew. We conclude that neither she nor her owners warranted her seaworthiness to plaintiff, nor was plaintiff injured in the breach of any such warranty.

Judgment is, therefore, affirmed.

ROSELLINI, C. J., HILL and OTT, JJ., and BARNETT, J. Pro Tem., concur.