**Otis C. MARTIN, Plaintiff,**

v.

**Sidney T. JONES and Jones' Offshore Boat Rental Service, Inc., Defendants.**

**No. 5795.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 3, 1968.

---

26. See Erie-Lackawanna R. R. Co. v. United States, D.C., 279 F.Supp. 316, 356.

Wilson M. Montero, Jr., Samuel C. Gainsburgh, New Orleans, La., for plaintiff.

N. B. Barkley, Jr., New Orleans, La., for defendant.

A. R. Christovich, Jr., New Orleans, La., for Harold P. Halter, d/b/a Halter Marine Service, and for Fidelity & Casualty Co. of New Jersey.

RUBIN, District Judge:

On March 19, 1962, the M/V JEAN A, owned and operated by defendant was brought to the Halter Marine Service Shipyard for minor repairs prior to a United States Coast Guard inspection. The vessel was to be painted, and, in order for this to be properly done, it was necessary to chip or grind down "burrs," minute projections of metal, preparatory to painting. Plaintiff, an employee of Halter Marine Service, boarded the vessel shortly after she arrived and began grinding down "burrs" on the after bulkhead. In accordance with his instructions, he used an air-grinder, which consists of an air-powered motor turning a carborundum wheel, or disc, the edge of which is applied to the burr and grinds it down to a smooth surface. The equipment was provided by Halter.

Halter kept all its equipment in a special tool room maintained by its employees. The equipment was checked out to the shipyard employees when they needed to use it. The same piece of equipment was not necessarily given the same employee each time he needed to use an item.

The plaintiff checked out the air-grinder at Halter's tool room, went directly to the vessel and began grinding. A fellow employee, Earl Morgan, testified that plaintiff had just begun grinding as he, Morgan, was boarding the vessel. He noticed plaintiff's body jerk, saw plaintiff start to fall, ran to the after bulkhead, turned off the grinder, and rendered assistance to plaintiff. He saw blood around plaintiff's left knee. With the assistance of other employees, Morgan carried plaintiff off the vessel and to a shed located in the Halter yard. Plaintiff was taken to the office of Dr. J. R. Diamond in Slidell, Louisiana. Dr. Diamond recommended surgery and operated on him that same afternoon at the Slidell Memorial Hospital.

In his operative procedure report Dr. Diamond states that "[t]he wound on

the anterior surface of the patella was thoroughly explored and a number of foreign bodies resembling carborundum was removed." Plaintiff remained in the hospital from the date of his accident until he was discharged nine days later; thereafter, he remained under out-patient care.

On the day after the accident Morgan returned to work. He then took a look at the grinder plaintiff had been using and noticed that the carborundum wheel, or disc, was fractured and that several pieces were missing. Halter's manager, Richard Gardebled, testified that the carborundum stone was removed from plaintiff's grinder and dispatched to the manufacturer for "tests." Neither the carborundum stone nor the manufacturer's representative who conducted the "tests" were produced at the trial.

Plaintiff continued under the care and attention of Dr. Diamond as an out-patient until September 4, 1962, when he was admitted to the Slidell Memorial Hospital for an arthrotomy of the left knee. He was discharged seven days later and resumed out-patient care.

Plaintiff's condition did not improve and he was referred to Dr. H. R. Soboloff of New Orleans who recommended a patellectomy. This was performed at the Flint-Goodridge Hospital in New Orleans. Plaintiff was admitted to the hospital on November 14, 1963, and discharged on November 20, 1963, to the out-patient care of Dr. Soboloff. On July 20, 1964, he was found able to return to work. During the period of time from the date of the injury until the date he could return to work, 120⅔ weeks, plaintiff was paid compensation by his employer's insurance carrier in the amount of $45.00 per week based on average weekly wages of $67.50 per week.

Plaintiff's residual disability, though hard to determine by a fixed percentage, is estimated as 15%–20% of the leg as a whole. Dr. Soboloff said that "[c]limbing stairs or ladders would be a definite problem and we do not feel that he could accomplish this without some degree of discomfort and possibly even pain, and climbing and trying to carry something would be too hazardous for him and he cannot be allowed to consider this."

O. Randall Bramman, Ph. D., Psychologist, indicated that plaintiff, after having been tested on two occasions, February 2 and 8, 1967, by quantitative analysis scored, at best, in the mild mentally retarded level (60–70 IQ), but qualitatively, his level of intellectual functioning was borderline (60–80 IQ).

After being discharged by his physicians, plaintiff secured employment as a janitor but his average annual wage was $984.95 less than he had earned before the accident. He was still so employed on the date of the trial of this matter.

### VESSEL IN NAVIGATION

By argument and post-trial brief defendant claims that the vessel was out of navigation, was a "dead ship" and, therefore, plaintiff was not entitled to a warranty of seaworthiness. An analysis of the "dead ship" litigation would compel a contrary conclusion. The cases cited by defendant involve vessels with their propellers removed and undergoing major repairs. Bishop v. Alaska Steamship Company, 66 Wash.2d 704, 404 P.2d 990 and Madden v. United States, D.C. Mass., 1966, 259 F.Supp. 663.

An illustration of cases holding that a vessel was, in fact, a "dead ship" are, Hawn v. American Steamship Company, 2 Cir., 1939, 107 F.2d 999, a vessel used as a floating storage bin for soya beans; Desper v. Starved Rock Ferry Co., 1952, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205, a vessel laid up for the winter; and West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, a vessel from the "moth-ball" fleet.

Cases holding that the vessel in question was not, in fact, removed from navigation and commerce are Hunt v. United States, S.D.N.Y., 1936, 17 F.Supp. 578, affirmed 2 Cir., 1937, 91 F.2d 1014, where the vessel was in drydock for two to three weeks for repairs; Drlik v. Im-

perial Oil Limited, N.D.Ohio, 1955, 141 F.Supp. 388, where the vessel was being undocked after having been repaired; and Lawlor v. Socony-Vacuum Oil Company, 2 Cir., 1960, 275 F.2d 599, 84 A. L.R.2d 613, where the vessel was moored in navigable waters for annual overhaul and repair.

■ In the instant case the vessel was in the yard for minor repairs for a period of three days. At all times her engines could be started. It was certainly not the intent of the owner to withdraw her permanently from commerce and navigation. Based upon these facts the court finds as a matter of fact that the M/V JEAN A was, in fact, a vessel engaged in commerce and in navigation. "When a vessel in navigable waters has been taken to a shipyard for voyage repairs or for repairs in connection with periodic inspection or classification, with the expectation of resuming transportation and commerce upon completion of the repairs, she is still a vessel in navigation. Her status would not be any different if the repairs were carried out—as it frequently happens—while the vessel is at dock-side with her cargo being discharged or received." Norris, Maritime Personal Injuries, Sect. 52, p. 119.

Defendant further contends that at the time of the accident plaintiff was not doing work that was historically and traditionally performed by seamen in that the type of equipment utilized for the job in question was not ordinarily carried aboard vessels. The vessel-owner, Richard Jones, testified that at one time he held a validated Chief Mate's license from the United States Coast Guard and that, to his knowledge, a grinder such as the one in question was not ordinarily carried by the deck department of merchant vessels. On cross-examination he could not state positively whether or not they would be carried by the vessel's engine department, but thought that the grinder could form part of the engine room's tools and equipment.

■ The court finds that, basically, what was being done was to chip or grind down a metal bulkhead so that it could be painted. Sailors have prepared vessel surfaces for painting ever since vessels were first painted. The methods of preparation of the surface have changed as the materials with which the vessels were built have changed and as new equipment became available. The mere fact that on this occasion a metal surface was being ground with a mechanical contrivance does not take the work out of the category of ship's work. The fact that today's *Sieracki*-seamen (Seas Shipping Company v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099) remove cargo from the vessels by use of power winches rather than carrying it ashore on their backs, as in the days of wooden ships and iron men, does not in law or in fact change their status.

Whether or not a grinder was ordinarily carried aboard vessels is not the conclusive test to be applied. We judge instead by "the type of work that [the seaman] did and its relationship to the ship and to the historic doctrine of seaworthiness." Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 413, 74 S.Ct. 202, 207, 98 L.Ed. 143.

## WARRANTY OF SEAWORTHINESS

Any questions as to whether equipment brought aboard the vessel by the contractor comes under the warranty of seaworthiness have been laid to rest in the celebrated "tent rope" case, Italia Societa, etc., v. Oregon Stevedoring Company, 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732. In that case a tent rope brought aboard the vessel by the contractor parted and caused injuries to a longshoreman. The vessel owner settled with the injured longshoreman and sought indemnification from the stevedore. The court held that the defective rope supplied by the stevedore created an unseaworthy condition and would not "* * * affect the shipowner's primary liability to the injured employee of [the stevedore], since its duty to supply a seaworthy vessel is strict and nondele-

gable * * *." Italia Societa, etc., v. Oregon Stevedoring Company, supra, at 323, 84 S.Ct., at 753.

■ There is no evidence from which the Court could conclude that the grinding wheel was itself defective. However, it is clear that a safety device was missing from the grinder, and it was not provided with a guardrail properly attached. This device is usually supplied to prevent exactly the type of injury sustained by plaintiff and the grinder wheels introduced in evidence carry a warning that one should be used. The foreman in charge of the work knew that the guard should have been affixed. Supplying this grinding wheel without a guardrail amounts to furnishing defective or unsafe equipment and rendered the vessel unseaworthy. Even "* * * the exercise of due diligence does not relieve the owner of his obligation to the seaman to furnish adequate appliances." Mahnich v. Southern S. S. Company, 1944, 321 U.S. 96, 100, 64 S.Ct. 455, 458, 88 L.Ed. 561.

■ Nor could it be argued that the owner could absolve himself of liability by relying upon the service of an experienced contractor. The duty to furnish a seaworthy vessel is absolute and nondelegable. The "* * * obligation of seaworthiness * * * is peculiarly and exclusively the obligation of the owner * * * [I]t is one he cannot contract away as to any workman within the scope of its policy. As we have said, he is at liberty to conduct his business by securing the advantage of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities." Seas Shipping Company v. Sieracki, supra, at 100, 66 S.Ct. 872, at 880. The court finds the defendant liable for damages for injuries proximately caused by a breach of the warranty of seaworthiness and must next consider the plaintiff's contributory negligence, if any.

## CONTRIBUTORY NEGLIGENCE

■ Plaintiff was an experienced grinder and was employed to work at that trade. Although there is evidence that he had limited mental ability, he should have known enough to understand the basic safety principles applicable to the work he was doing.

He himself must have known or should have known that the grinder should have been guarded with a steel rail or guard. Under these circumstances I think there is contributory negligence on his part. It is obviously difficult to fix the amount of such negligence, but I fix it as one-third, that is, thirty-three and one/third per cent ($33\frac{1}{3}\%$) of the causative factors.

## QUANTUM

In fixing damages, we first consider lost wages. Since plaintiff had been employed by Halter for only several days before the accident, he presented the court with computations based on earnings in other employment. I do not think they fairly represent what plaintiff's wages would have been had he remained in Halter's employment. The court finds that the fairest figure for computation of lost wages is that utilized by the Department of Labor in computing plaintiff's benefits under the Longshoremen's and Harbor Workers' Act, that is, $22.00 average weekly wages, lost for $120\frac{4}{7}$ weeks. This amounts to $2,652.00, which should be added to the compensation paid, $9,184.11.

With respect to future loss of income, we should take into account not only the amount by which plaintiff's present wages are less than his wages at the time of the accident, which has been narrowed by his progress on his present job, but also in fact that he would undoubtedly have received some measure of increase in wages had he been able to continue to work in a shipyard.

Plaintiff is a true industrial casualty, a man of limited education and limited mentality, but one who could work, in an

industrial sense, productively. He can no longer work as a semi-skilled worker, which is the most he could have hoped for. Thus he is reduced to doing unskilled labor as a porter or janitor. The Court finds that plaintiff's measure of future loss of wages is a reasonable approach. This sum should be discounted at five (5%) per cent. The Court finds that plaintiff will sustain an average annual wage loss of $984.45. When discounted for a twenty-year period, to age sixty-five, at five (5%) per cent, this yields a figure of $12,274.45.

The plaintiff had a painful injury. He was admittedly off work for 120 weeks because this is the period for which compensation was paid him and, therefore, regardless of the medical findings, this must be assumed to be the period that concededly he was unable to return to work. I think $7,500.00 is a modest award for past pain and suffering.

The plaintiff will have some future disability for the rest of his life. He is a forty-five year old man and will have the aggravated aches and pains that are going to accompany his disability for the future. I think that $7,500.00 is a reasonable figure for his future pain, suffering and disability.

"In admiralty, interest on claims arising out of breach of contract is a matter of right but the allowance of interest on damages in cases of collision, or other tort or for unliquidated damages, is always in the discretion of the Court and such interest may be allowed or disallowed by the District Court or on appeal by the Circuit Court of Appeals or by the Supreme Court." 3 Benedict, § 419, pp. 191–192.

■ The court has considered whether interest should be awarded from the date of judicial demand or only from the date of judgment. This matter lies entirely within the discretion of the court. 3 Benedict, § 419, pp. 191–192. The delay in reaching trial was not the fault of any of the parties, but was the result of factors completely beyond their control. While the defendant has had the use of the sums awarded, the plaintiff has not suffered any deprivation in the usual sense during the pendency of the action other than a loss of possible income on the funds had the plaintiff been able to invest them. More than half the damages awarded to plaintiff are for loss of future earnings and for future pain and suffering. The plaintiff has indicated no reason why interest should be awarded from the date of judicial demand. For these reasons, this appears to be a proper case for the court to award interest only from the date of judgment.

An intervention was filed to recover weekly compensation benefits paid pursuant to authority of the Longshoremen's and Harbor Workers' Compensation Act in the amount of $9,184.11. This amount will be awarded to intervenor.

■ The Clerk will prepare judgment in favor of plaintiff and against defendant, Sidney T. Jones and Jones' Offshore Boat Rental Service, Inc. in the amount of $16,889.60; and in favor of intervenor, The Fidelity & Casualty Company of New York against the same defendant in the amount of $9,184.11.