465 F.2d 1157
 Nolan Joseph BARRIOS, Plaintiff-Appellee-Cross Appellant,
v.
LOUISIANA CONSTRUCTION MATERIALS COMPANY et al., Defendants-Appellees,
Williams-McWilliams Industries, Inc.,
Defendant-Appellant-Cross Appellee.
 No. 71-2029.
 United States Court of Appeals,
 Fifth Circuit.
 Aug. 1, 1972.
Rehearing and Rehearing En Banc Denied Sept. 19, 1972.
 
 Ralph E. Smith, Deutsch, Kerrigan & Stiles, New Orleans, La., for Employers Group Ins. Co. and Williams-McWilliams Industries, Inc.
 James A. Wysocki, Fritz H. Windhorst, for Barrios.
 Clarence A. Frost, Robert O. Holmes, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for A. O. Rappelet and Louisiana Const. Materials Co.
 Before RIVES, BELL and MORGAN, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 This case involves a claim for personal injuries under the Jones Act[1] and the general maritime law. In the court below, Nolan J. Barrios obtained a judgment against Williams-McWilliams Industries, Inc. (hereinafter Williams-McWilliams) and A. O. Rappelet d/b/a Louisiana Construction Materials (hereinafter Rappelet) as joint tort-feasors. Rappelet successfully cross-claimed against Williams-McWilliams for indemnification. On appeal, all of the parties have assigned various points of error. After reviewing these contentions, we affirm the judgment of the district court in all respects.
 
 I.
 
 2
 In 1965 Williams-McWilliams contraced with the Greater Lafourche Port Commission for construction of port facilities adjacent to Bayou Lafourche, Louisiana. The contract called, inter alia, for the construction of a flood protection levee near Bayou Fourchon. To build the levee, Williams-McWilliams rented from Louisiana Construction Materials Company a 90-ton dragline.
 
 
 3
 Louisiana Construction Materials Company was a sole proprietorship owned by A. O. Rappelet who was also president of the Greater Lafourche Port Commission. Rappelet's position on the Port Commission barred his company from contracting directly with the Port Commission, but did not prohibit the leasing of equipment to the various contractors doing work for the Port Commission.
 
 
 4
 Williams-McWilliams hired appellee Barrios to serve as an oiler on the dragline. Barrios had been employed by Rappelet as an oiler on the dragline prior to its rental to Williams-McWilliams for the levee work, and was hired by Williams-McWilliams because he was familar with the equipment and available for work. Also hired was another former Rappelet employee, Junius Dufrene, to serve as the operator of the dragline.
 
 
 5
 Work commenced on the levee in August, 1965, when the dragline was loaded on a spud barge and transported to Bayou Fourchon where it was unloaded. The dragline began operations 500 feet from the water's edge and moved inland. The barge remained at the worksite and was used to store oil, fuel, and equipment for the dragline.
 
 
 6
 Shortly thereafter operations were suspended because of Hurricane Betsy. While the work was suspended, the dragline was loaded on the barge and returned to Leeville and subsequently rented to Gulf Oil Corporation for dredging operations in Timbalier Bay. During the operation in Timbalier Bay, the dragline remained onboard the barge and operated from it. Dufrene and Barrios remained with the dragline and were shifted back to Rappelet's payroll. By late November, 1965, the work for Gulf was completed and the dragline was moved back to Bayou Fourchon where work on the levee resumed. Dufrene and Barrios returned to the Williams-McWilliams payroll.
 
 
 7
 In January, 1966, the dragline became bogged down in mud. The spud barge with Dufrene and Barrios aboard was towed to the Port Commission facility in order to obtain a second dragline to help free the first 90-ton dragline and get it back into operation. The second dragline was loaded on the barge on January 21, 1966.
 
 
 8
 Shortly after the second dragline was loaded on the barge, it was discovered that the lifting cable of one of the barge's spuds was fouled. Spuds are vertical steel columns at each end of the barge. When the barge is afloat, the spuds are lowered to the water bottom and serve to hold the barge in place. Each spud is equipped with a power winch and cable by which it is raised or lowered. Thus, it was necessary to remove and replace the fouled cable before the barge could be moved.
 
 
 9
 The second dragline, which was then on the barge, was used to raise the spud. On this particular spud, the dogs had been removed so that the spud could not be locked in the raised position. Thus, it was necessary to use the dragline to hold up the spud. With the weight of the spud off the cable, the cable was pulled from the sheaves in the spud by hand. While physically pulling on the cable, Barrios sustained an injury to his back. Barrios reported his injury within a few days. Thereafter, he began receiving Louisiana State Workmen's Compensation from Williams-McWilliams at the rate of $35.00 per week.
 
 
 10
 Payments were terminated when Barrios brought the instant suit naming Rappelet and Williams-McWilliams as defendants. Also named as defendants were Employers Group Insurance Company and ABC Insurance Group, the liability insurers for the two companies. Barrios' complaint alleged Jones Act negligence as well as unseaworthiness as the bases for recovery. Simultaneously, Barrios brought a second action against Rappelet and Williams-McWilliams for maintenance and cure and for damages for failure to pay maintenance and cure. The two actions were consolidated for trial.
 
 
 11
 Williams-McWilliams cross-claimed against Rappelet for indemnification and for recovery of $4,628.21 in workmen's compensation benefits paid to Barrios. Likewise, Rappelet cross-claimed against Williams-McWilliams for indemnification. The cases were tried to a jury, except that the cross-claims for indemnification were tried to the court. On the basis of answers to written interrogatories to the jury,[2] judgment was entered for the plaintiff Barrios against all defendants on all claims except for damages for willful failure to pay maintenance and cure. On that issue, the jury failed to reach a verdict, and by agreement, the matter was submitted to the court. The court dismissed the claim. The court ruled in favor of Rappelet and against Williams-McWilliams on the cross-claims for indemnification.
 
 II.
 
 12
 A. The remedial ambit of the Jones Act extends only to injured individuals who are "seamen" and "members of a crew" of a vessel.[3] See Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946). Williams-McWilliams' initial contention is that the evidence is insufficient to support the jury's finding that Barrios was a seaman. We disagree.
 
 
 13
 Traditionally, it has been said that there are three requirements which must be present in order for the injured individual to qualify as a seaman: (1) there must be a vessel in navigation; (2) the individual must have a more or less permanent connection with the ship; (3) the capacity in which the individual is employed or the duties which he performs must contribute to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips. See Offshore Company v. Robison, 5 Cir. 1959, 266 F.2d 769; McKie v. Diamond Marine Company, 5 Cir. 1953, 204 F.2d 132; Brannan v. Great Lakes Dredge & Dock Co., 253 Minn. 28, 91 N.W.2d 166 (1958).
 
 
 14
 However, at least since the Supreme Court's two decisions in Senko v. La Crosse Dredging Corporation, (1957) 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, reh. den. 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724 and Grimes v. Raymond Concrete Pile Co. (1958), 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737, it has been clear that it is a rare case indeed in which a court may conclude as a matter of law that an injured individual is not a seaman within the meaning of the Jones Act. In Senko the court held that:
 
 
 15
 Our holding * * * that the determination of whether an injured person was a "member of a crew" is to be left to the finder of fact mean[s] that juries have the same discretion they have in finding negligence or any other fact. The essence of this discretion is that a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate.
 
 
 16
 The facts of these two cases, particularly of Grimes, make it plain that the issue is to be left to the jury even when the claim to seaman status appears to be a relatively marginal one.[4]
 
 
 17
 In applying Senko and Grimes, this circuit has held that even where the underlying facts are largely undisputed, the determination of whether an individual is a seaman will ordinarily be left to the jury. As this court observed in the leading case of Offshore Company v. Robison, 5 Cir. 1959, 266 F.2d 769, 780:
 
 
 18
 Attempts to fix unvarying meanings having a firm legal significance to such terms as "seaman", "vessel", "member of a crew" must come to grief on the facts. These terms have such a wide range of meaning, under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine their application in the circumstances of a particular case. Even where the facts are largely undisputed, the question at issue is not solely a question of law, when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts.
 
 
 19
 See also Bodden v. Coordinated Caribbean Transport, Inc., 5 Cir. 1966, 369 F.2d 273.
 
 
 20
 After reviewing this record carefully, we conclude that it affords a reasonable basis for the jury's conclusion that Barrios was a member of the crew of the spud barge. The record reveals that Barrios started working with the spud barge and dragline in May, 1965, and that he continued to work with the same barge and dragline for a succession of employers until the day of his injury. A substantial portion of the time he worked with this barge and dragline, the dragline remained aboard the barge to perform the work. Even when the dragline was removed from the barge for inland work, the barge acted as both the work boat and the supply area for the dragline's spare parts, tools, lubricants and fuel.
 
 
 21
 On the Williams-McWilliams job, it is conceded that the dragline was temporarily operating on shore some 500 feet from the spud barge. Even then, however, the dragline's supplies remained aboard the barge and Barrios had the duty to maintain and supply both the barge and the dragline as well as to operate a small lugger. He also had to pump out the barge three or four times a week.
 
 
 22
 When the dragline bogged down, Barrios accompanied the barge back to the Port Commission warehouse where another dragline was secured in an effort to unmire the first dragline. During this operation and while Barrios was aboard the barge his injury occurred. This evidence afforded an ample evidentiary basis for the jury's conclusion that Barrios was a seaman within the meaning of the Jones Act.
 
 
 23
 B. Williams-McWilliams' second contention is that the evidence is insufficient to support the jury's finding that Barrios was injured in the course of his employment with Williams-McWilliams. In particular, Williams-McWilliams argues that the decision to utilize a second dragline to free the mired 90-ton dragline was made by Rappelet's superintendent Galiano without the knowledge of Williams-McWilliams. It is urged that Galiano ordered Dufrene and Barrios to use the second dragline solely to benefit Rappelet because no rental fees accrued for the first dragline while it was inoperable, and thus that they were the "borrowed servants" of Rappelet at the time of the accident.
 
 
 24
 The short answer to this argument is that it was resolved against Williams-McWilliams by the jury.[5] There was evidence in the record which showed that Williams-McWilliams was under contract with the Greater Lafourche Port Commission to construct a flood protection levee. Dufrene and Barrios were concededly hired by Williams-McWillaims to work on this project. Dufrene and Barrios were supervised by Anthony Bevinetto, a Williams-McWilliams' employee in charge of the completion of the levee project. However, Barrios' immediate supervisor was Dufrene.
 
 
 25
 Galiano, who was employed by Rappelet, also served as a Commissioner and Vice President of the Port Commission. He testified that he made weekly inspections of the levee work on behalf of the Port Commission. While Galiano admittedly discussed the problem of the mired dragline with Dufrene, there is no evidence that he directly ordered Dufrene to use the second dragline. Moreover, he did not supervise or have any connection with the loading of the second dragline. This evidence afforded an ample basis for the jury's determination that Barrios was acting within the scope of his employment to further the interests of his employer Williams-McWilliams in completing its contract with the Port Commission at the time of the accident.
 
 
 26
 C. On special interrogatories, the jury found that Barrios was a member of the crew of the barge,[6] that he was injured on the barge while in the scope and course of his employment with Williams-McWilliams,[7] that Williams-McWilliams was negligent,[8] and that this negligence was a cause of Barrios' injuries.[9] Based on these findings, judgment was entered against Williams-McWilliams on Barrios' claim under the Jones Act. However, the jury also returned interrogatories finding that Rappelet, not Williams-McWilliams, was the "operator" of the barge[10] and thus liable to Barrios under the general maritime law for the barge's unseaworthiness.
 
 
 27
 Williams-McWilliams seizes upon these apparent contraditions in the jury's answers to the interrogatories to argue that they bar the imposition of liability. In particular, Williams-McWilliams argues that the jury's finding that it was not the "operator" of the barge precludes liability under the Jones Act. We disagree.
 
 
 28
 It is long settled that this court is bound to reconcile apparently contradictory answers to jury interrogatories if at all possible. See Rorem v. Halliburton Oil Well Cementing Co., 5 Cir. 1957, 246 F.2d 427, 432; R. B. Company v. Aetna Insurance Company, 5 Cir. 1962, 299 F.2d 753, 759. In this case we believe that the interrogatories can be satisfactorily rationalized. The jury's answer to Interrogatory No. 5 that Rappelet was "operating" the barge was apparently based on three facts. First, it was conceded that Rappelet was the owner of the barge; second, the jury apparently credited williams-McWilliams' contention that it had leased only the dragline from Rappelet, but that it had not leased the barge; and third, Rappelet's tug was being used to tow the barge. Based on this evidence, the jury concluded that Rappelet had operational control over the movement of the tug and the barge.
 
 
 29
 Nevertheless, the jury also concluded that Barrios was employed by Williams-McWilliams; that he was assigned by his employer to a more or less permanent relationship with the barge; and that the negligence of Williams-McWilliams was a cause of the injury. These findings all had a reasonable basis in the record. There was evidence in the record that Barrios' immediate supervisor was Dufrene, a Williams-McWilliams employee, who directed the efforts to free the fouled spud cable. The evidence further showed that Dufrene was negligent in selecting the method used to free the fouled cable, and that this negligence caused Barrios' injury. This negligence would be attributable to Williams-McWilliams under respondeat superior. Thus, while the jury found that Rappelet had ultimate control over the movement of the vessel, it also apparently found that Williams-McWilliams had immediate control over the operations which resulted in the injury to Barrios. It is our view that this finding was sufficient to support Jones Act liability.
 
 
 30
 As the court' charge[11] makes clear, Interrogatories 5 and 7 were submitted to the jury to take account of the possibility that Barrios might be entitled to Sieracki-style recovery from either of the parties.[12] Those interrogatories are largely irrelevant to the question of whether the master-servant relationship exists, which is the foundation of Jones Act liability. See Cosmopolitan Shipping Company v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949).
 
 
 31
 Williams-McWilliams cites a number of cases for the proposition that the Jones Act imposes an independent requirement that the Jones Act defendant must be either an "owner" or an "operator" of a vessel before liability can be imposed. Certain of the cited cases appear plainly inapposite as the following discussion will demonstrate. Others do appear to support the proposition asserted and to that extent they are irreconcilable with other cases cited by Barrios which announce precisely the opposite rule.
 
 
 32
 The cases of Watson v. Gulf Stevedore Corporation, 5 Cir. 1967, 374 F.2d 946, and Thomas v. Peterson Marine Service, Inc., 5 Cir. 1969, 411 F.2d 592, cited by Williams-McWilliams to support the proposition that a Jones Act defendant must own or operate the vessel are not in point. Both cases involved suits by longshoremen against their stevedoreemployers. This court held that the suits could not be brought under the Jones Act or the general maritime law, and that the employee's exclusive remedy against the stevedore-employer was under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 et seq. In both cases, the court held that relief was unavailable under the Jones Act because the employees lacked a sufficiently permanent connection with the vessels on which they were working to qualify as seamen. The reference in the opinions to the absence of an ownership or operational control of the vessels on the part of the employer was merely for the purpose of distinguishing the cases from Reed v. Steamship Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, in which it was held that a longshoreman could maintain a libel for damages against his employer if the employer was also the owner or operator of the vessel and as such was liable for unseaworthiness.
 
 
 33
 Ross v. Delta Drilling Company, D.C. 213 F.Supp. 270 (1962), is more closely in point, but we are not convinced that it fully supports the proposition asserted. In that case, the plaintiff sought recovery against his employer, Delta Drilling Company, for injuries sustained while working on a vessel operated by Humble Oil. The court denied recovery on the dual bases that the plaintiff was not a seaman and that there was no proof of employer negligence. In its opinion, the court emphasizes the fact that the employer had no operational control over the vessel, but does so only to buttress its conclusions that the plaintiff was not a seaman and that employer negligence was not a cause of the injury. The opinion does not suggest that absence of operational control of the vessel would independently bar recovery.
 
 
 34
 Case v. St. Paul Fire and Marine Insurance Co., D.C., 324 F.Supp. 352 (1971) involved a suit against an attorney for an alleged negligent failure to timely pursue claims for personal injuries under the Jones Act. Certain dicta in the opinion does suggest that a Jones Act defendant must operate the vessel to which the seaman is attached. Similarly, in Williamson v. Daspit Bros. Marine Divers, Inc., 5 Cir. 1964, 337 F.2d 337, this court approved a charge to the jury on a Jones Act case in which the court stated that if the jury found the decedent to be a member of the crew of the vessel, it must "go to the next question and decide whether or not that vessel was under the control or command or operated by * * * [the employer-defendant]." Elsewhere the court's charge stated the essential elements of a Jones Act claim as follows:
 
 
 35
 If you find, first, that the deceased was an employee of the defendant, and secondly that he was a seaman and a member of the crew of the vessel Aline 'B' at the time of the accident and third that his employer did have control or command over the operation and movements of the Aline 'B', and fourth that the defendant * * was guilty of negligence proximately causing the accident complained of, then you must find for the plaintiff.
 
 
 36
 This court sustained the charge against a claim that it improperly added an unnecessary element to the cause of action. The court observed that the charge was not harmful on the facts of the case because "the main issue was whether the decedent was an employee or an independent contractor". This statement may imply that the court rejected any general rule that the Jones Act defendant must have operational control over the vessel.
 
 
 37
 In contrast, Barrios has cited several cases which seem to announce precisely the opposite rule. In Sims v. Marine Catering Service, Inc., D.C., 217 F.Supp. 511 (1963), recovery was permitted under the Jones Act against an employer that did not own or operate the vessel on which the employee worked. In that case, the defendant-employer was a marine catering service. The plaintiff was a messman employed regularly on a vessel, the M/V S 22. Although the catering service did not have operational control over the vessel, recovery was permitted. Similar recovery was permitted in Williams v. Milwhite Sales Co., D.C., 197 F.Supp. 730. There, the defendant-employer operated a warehouse with wharf frontage from which chartered barges were loaded with bags of drilling mud. The barges, towed by a chartered tug, were brought alongside offshore drilling rigs and unloaded. The plaintiff-employee alleged that he was a member of the crew of the tug and barge used to transport the mud. Although employed by the warehouse, it was his job to assist in loading the barge, to accompany the barge and the tug to location, and to assist in unloading. This operation often took several days, during which he slept and ate aboard the barge and tug. The employer moved to dismiss the Jones Act claim on the ground that it neither owned nor operated the tug or the barge. The court denied the motion, observing:
 
 
 38
 Nor can the fact that his employer does not control the operation of the vessel affect his rights under the Jones Act. Irrespective of what arrangements his employer may make with other persons relative to the operation and navigation of the vessels, if in fact the employee is contributing to the current mission of the vessel, on a more or less permanent basis, then, in law, he becomes a member of a crew of a vessel.
 
 
 39
 See also Constance v. Johnston Drilling Company, 5 Cir. 1970, 422 F.2d 369; Davis v. Associated Pipe Line Contractors, Inc., D.C., 305 F.Supp. 1345; Smith v. Dale Hart, Inc., D.C., 313 F.Supp. 1164.
 
 
 40
 As is evident, the cases are in substantial conflict on this point. Thus, we are constrained to decide this case on its individual facts. On the facts of this case, we think it is clear that Williams-McWilliams is a proper Jones Act defendant even though the jury determined that it did not have operational control over the vessel. The jury found that Barrios was employed by Williams-McWilliams and assigned to duties which bore a sufficiently permanent connection to the spud barge to qualify Barrios as a member of its crew. In addition the jury found that Williams-McWilliams supervised the particular operations which gave rise to Barrios' injury and that the negligence of Williams-McWilliams was a cause of the injury. Where the plaintiff has established these traditional elements of a Jones Act recovery, it would be a strained and artificial construction of the Act to impose any additional requirement that the defendant have operational control over the entire vessel.
 
 
 41
 D. The cross claims of Rappelet and Williams-McWilliams for indemnification were tried to the court. The court ruled that Williams-McWilliams' negligence was active while the negligence of Rappelet was passive and granted indemnification to Rappelet. Williams-McWilliams contends that this ruling was erroneous.
 
 
 42
 In Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co., 5 Cir. 1969, 410 F.2d 178, this court held that in federal maritime cases, general tort principles give rise to a right of indemnity by a tort-feasor who is "passively" or "secondarily" liable against a joint tortfeasor guilty of "active" or "affirmative" negligence. This right of indemnity arises independently of any contractual rights of indemnity which the parties may have.[13] Thus, the narrow issue presented for review is whether the court's ruling that Rappelet's negligence was passive and Williams-McWilliams' negligence was active is clearly erroneous. We conclude that it was not.
 
 
 43
 As to the negligence of Williams-McWilliams, there was evidence in the record that Barrios sustained his injury while acting under the supervision of Dufrene, a Williams-McWilliams' employee, who directed the efforts to free the fouled cable. There was evidence that the cable had become fouled in November, 1965, while the barge was under Williams-McWilliams' control. Finally, there was evidence that Williams-McWilliams' employees had permitted mud to accumulate on the deck of the barge and that the mud had caused Barrios to slip while pulling on the cable.
 
 
 44
 In contrast the only act of negligence attributable to Rappelet was the removal of the dog[14] from the spud by Vizier, a welder employed by Rappelet, several months prior to the injury. Evidence indicated that because the dog was missing, the spuds could not be held in the raised position and it was necessary to use the dragline to life the spud as the cable was pulled out by hand.
 
 
 45
 The district court concluded that the primary cause of Barrios' injury was the negligence of Williams-McWilliams in that "Dufrene knew, or should have known, * * * that the method of work chosen to free the fouled cable was unsafe". It is our view that this factual determination was not clearly erroneous.
 
 
 46
 Williams-McWilliams urges that the district court's ruling on the indemnification issue is inconsistent with the jury's answers to the special interrogatories which found that the barge was unseaworthy; that Rappelet was negligent; and that Rappelet was the operator of the barge. We disagree. The court's ruling did not exclude the possibility that Rappelet was also negligent. As one court has observed, "The basis of [indemnification] is not freedom from negligence of the indemnitee, but the primary fault of the indemnitor". Greenville Shipbuilding Corp. v. Hartford Accident & Indemnity Co., D.C., 334 F.Supp. 1228 (1971). In this case the unseaworthiness of the barge for which Rappelet was responsible could never have injured Barrios but for the supervening negligence of Williams-McWilliams' employee Dufrene. In that respect, this case is analogous to the numerous contractual indemnity cases in which we have held that the latent unseaworthiness of a vessel will not bar the vessel owner from recovering indemnification as against the stevedore whose active negligence brings the dormant unseaworthiness into play. See Strachan Shipping Company v. Alexander, 5 Cir. 1962, 311 F.2d 385; Dziedzina v. Dolphin Tanker Corp., 3 Cir. 1966, 361 F.2d 120; T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir. 1966, 362 F.2d 745; Mortensen v. A/S Glittre, 2 Cir. 1965, 348 F.2d 383.
 
 
 47
 E. Williams-McWilliams' final contention is that the court erred in granting judgment against it for maintenance and cure. We disagree. Basically, Williams-McWilliams is again contending that the jury's determination that Barrios was injured while in the employ of Williams-McWilliams has no basis in the record. In view of our holding in Part II-B, supra, that the record supports that jury determination, we conclude that judgment was properly entered against Williams-McWilliams for maintenance and cure.
 
 III.
 
 48
 Barrios has filed a limited appeal in which he attacks the court's refusal to award him prejudgment interest. In the court below, Barrios requested a jury charge and interrogatory which would have allowed the jury to determine the date from which legal interest would accrue. The proposed interrogatory would have permitted the jury to select either the date of the injury, the date of judicial demand, or the date of judgment. The court declined to submit the issue to the jury. The jury returned its verdict in favor of Barrios on January 14, 1971. Approximately six weeks later, the judgments were entered on the verdict. Motions to amend these judgments to include pre-judgment interest were filed and were summarily denied.
 
 
 49
 Initially Barrios contends that the court erred in not submitting the question of prejudgment interest to the jury. Although Barrios has extensively briefed this point, the short and inescapable answer to his contention is that this argument is foreclosed by our previous decision in Sanford Bros. Boats, Inc. v. Vidrine, 5 Cir. 1969, 412 F.2d 958. In that case, this court ruled that it was error for the district court to award prejudgment interest, on a Jones Act claim tried on the law side. The case at bar cannot be distinguished in any meaningful sense from that case. See also National Airlines, Inc. v. Stiles, 5 Cir. 1959, 268 F.2d 400; Casey v. American Export Lines, 2 Cir. 1949, 173 F.2d 324; Cortes v. Baltimore Insular Line, Inc., 2 Cir. 1933, 66 F.2d 526; Cleveland Tankers v. Tierney, 6 Cir. 1948, 169 F.2d 622.
 
 
 50
 Barrios invites the court to reconsider the rule announced in Vidrine. However, this is an inappropriate case to even consider the question. Unlike collision cases[15] and wrongful death cases[16] where the loss, although unliquidated, occurs at one time and is measurable as of that time, this is a case in which the damages awarded by the jury included substantial compensation for future pain and suffering and future loss of earnings. Thus, even had the case been tried on the admiralty side of the court, it is highly unlikely that prejudgment interest would have been awarded. See, e. g., Martin v. Jones, D.C., 296 F.Supp. 878 (1968).
 
 
 51
 Barrios also urges that interest should run from the date of verdict rather than from the date of entry of judgment. Barrios contends that the sixweek delay on the part of the court in entering judgment on the verdict was an abuse of discretion which requires that interest run from the earlier date. We disagree.
 
 
 52
 Title 28 U.S.C., Sec. 1961, explicitly provides that "interest shall be calculated from the date of the entry of the judgment", not from the date of the verdict. See Millers' National Insurance Co. v. Wichita Flour Mills Co., 10 Cir. 1958, 257 F.2d 93, 104. Even if one assumes arguendo that some relief would be available where the court unreasonably delays in entering judgment, cf. Louisiana & Arkansas Ry. Co. v. Pratt, 142 F.2d 847, it is plain that this is not such a case. Here the six-week delay in entering judgment was not unreasonable. Two separate issues had been tried to the court-the liability of defendants for an alleged willful refusal to pay maintenance and cure, and the cross claims for indemnification. In deciding these issues it was necessary for the court to prepare findings of fact and conclusions of law. Six weeks is not an unreasonable time in which to discharge these functions.
 
 IV.
 
 53
 Rappelet urges that the jury's findings that Louisiana Construction Materials Company was the operator of the barge and that it was guilty of negligence which proximately caused the injury to Barrios is unsupported by the evidence. We have carefully reviewed the record and conclude that the jury's finding had a reasonable basis in the evidence.
 
 
 54
 Affirmed.
 
 
 55
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 56
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 
 [1]
 46 U.S.C. Sec. 688. The Act provides as follows:
 Recovery for injury to or death of seaman
 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
 
 
 [2]
 The interrogatories and the jury's answers to them are as follows:
 
 
 [1]
 Did plaintiff, NOLAN J. BARRIOS, sustain an injury while working on or about January 21, 1966?
 Yes X No -
 
 
 [2]
 If yes to 1, did this injury occur aboard the spud barge?
 Yes X No -
 
 
 [3]
 If yes to 2, was this spud barge unseaworthy?
 Yes X No -
 
 
 [4]
 If yes to 3, was this unseaworthiness a proximate cause of any injury to NOLAN J. BARRIOS?
 Yes X No -
 
 
 [5]
 If yes to 2, who was the operator of this spud barge? (check one) - Williams-McWilliams Industries, Inc
 X A. O. Rappelet, doing business as Louisiana Construction Materials Co.
 
 
 [6]
 If yes to 1 or 2 or both, was NOLAN J. BARRIOS a seaman and a member of the spud barge's crew?
 Yes X No -
 
 
 [7]
 If yes to 4, then did plaintiff NOLAN J. BARRIOS perform work customarily performed by seamen or incur hazards customarily incurred by seamen?
 Yes X No -
 
 
 [8]
 Was the plaintiff acting in the course and scope of his employment as the employee of Williams-McWilliams Industries, Inc. on January 21, 1966, at the time of the accident
 OR
 Was the plaintiff acting in the course and scope of his employment as the employee of A. O. Rappelet, doing business as Louisiana Construction Materials Co. on January 21, 1966, at the time of the accident? (Check one)
 X Williams-McWilliams Industries, Inc.
 - A. O. Rappelet, doing business as Louisiana Construction Materials Co.
 
 
 [9]
 Was this employer negligent?
 Yes X No -
 
 
 [10]
 If yes to 9, did this negligence play any part, even the slightest in causing injury to NOLAN J. BARRIOS?
 Yes X No -
 
 
 [11]
 Was the party whom you found in #8 NOT to be the employer negligent?
 To put it another way, was the non-employer defendant negligent?
 Yes X No -
 
 
 [12]
 If yes to 11, was this negligence a proximate cause of any injury to NOLAN J. BARRIOS?
 Yes X No -
 
 
 [13]
 Was NOLAN J. BARRIOS negligent?
 Yes X No -
 
 
 [14]
 If yes to 13, was this negligence a cause of his own injury?
 Yes X No -
 
 
 [15]
 If yes to 14, what part expressed in a percentage, did plaintiff's negligence, if any, play in causing his own injuries?
 10%
 
 
 [16]
 If yes to 4 or 10 or 12, or all of these, what is the total amount of damages sustained by NOLAN J. BARRIOS, without a reduction for his own negligence, if any?
 $90,000.00
 
 
 [3]
 The term "seaman" is contained in the original Jones Act enacted in 1920. Merchant Marine Act of June 5, 1920, 41 Stat. 1007. In 1927 Congress enacted the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 et seq., which extended to all maritime workers except masters or "members of a crew of a vessel". The Supreme Court held that the effect of the Act was to restrict the benefits of the Jones Act to "members of a crew of a vessel". Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045. The terms "seaman" and "member of a crew" are now used interchangeably
 
 
 [4]
 Mr. Justice Harlan's dissent in Grimes concluded, "I can find no room for debate that this individual is not a seaman, unless a 'seaman' is to mean nothing more than a person injured while working at sea." 356 U.S. at 255, 78 S.Ct. at 689, 2 L.Ed.2d at 740
 
 
 [5]
 See Interrogatory No. 8
 
 
 [6]
 See Interrogatory No. 6
 
 
 [7]
 See Interrogatory No. 8
 
 
 [8]
 See Interrogatory No. 9
 
 
 [9]
 See Interrogatory No. 10
 
 
 [10]
 See Interrogatory No. 5
 
 
 [11]
 On that issue, the court charged the jury as follows:
 Now, there is one further matter which you must consider in connection with the seaworthiness claim. Should you find that the plaintiff was employed by one defendant at the time of the accident but that the barge was operated by the other defendant at that time, then the non-employer defendant who was the operator of the spud barge at the time of the accident owed the plaintiff the warranty of seaworthiness only if the plaintiff was doing seaman's work or incurring seaman's hazards at that time. Therefore, if you find that at the time of the accident the plaintiff was aboard the spud barge performing work traditionally done by seamen and incurring hazards usually incurred by seamen, you may find that a defendant who operated the barge but did not employ the plaintiff (if you should find that this was the case) nevertheless owed the plaintiff the warranty of seaworthiness.
 
 
 [12]
 Sea Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)
 
 
 [13]
 See Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133
 
 
 [14]
 "Dogs" are locking devices on the spuds
 
 
 [15]
 See e. g., O'Donnel Transportation Company, Inc. v. City of New York, 2 Cir. 1954, 215 F.2d 92
 
 
 [16]
 See e. g. National Airlines v. Stiles, 5 Cir. 1959, 268 F.2d 400